UNITED STATES of America
v.
James E. PAPWORTH.
Cr. No. 9775.

United States District Court
N. D. Texas,
Fort Worth Division.
Nov. 11, 1957.

Heard L. Floore, U. S. Atty., Fort Worth, Tex., for plaintiff, the United States.

Green, Byron & Wright, Randell C. Riley, Fort Worth, Tex., for defendant, James E. Papworth.

ESTES, District Judge.

The indictment in this case charged the defendant under Section 371, Title 18 United States Code, with a conspiracy to violate Section 2113(a) of Title 18 United States Code, that is to rob Carswell Air Force Base Facility of the Fort Worth National Bank, a banking insti-

844

tution organized and operating under the laws of the United States.

Prior to the trial defendant filed (1) a motion seeking to dismiss the indictment, to suppress evidence and for a bill of particulars, and (2) motion to instruct the government to produce records.*

### Motion To Dismiss Indictment

The basis of the motion to dismiss is that "Carswell Air Force Base Facility is not a bank and is not a banking institution." The defendant contends that under the laws of the State of Texas the Carswell Air Force Base Facility could not be a bank or banking institution because Article 342–903 Vernon's Annotated Civil Statutes of the State of Texas prohibit branch banks. Therefore, the defendant says that the indictment does not allege any cause of action under Section 2113(a) of Title 18 United States Code which states that it is a violation to take by force from a bank or banking institution.

■ The indictment on its face stated that Carswell Air Force Base Facility of the Fort Worth National Bank was "a bank and banking institution". Moreover, the proof offered on the motion and at the trial sustained the allegation in the indictment. Black's Law Dictionary, Fourth Edition, defines a bank as "an institution * * * empowered to receive deposits of money, to make loans, and to issue its promissory notes * * or to perform any one or more of these functions." Bouvier's Law Dictionary unabridged, defines a bank as "a place for the deposit of money". The Texas Banking Code, in Article 342–701 defines the term "bank" to include "any person, firm or corporation engaged in the business of receiving and paying deposits".

■ Since Carswell Air Force Base Facility accepts deposits, cashes checks and provides paying and receiving facilities for officers, enlisted personnel and

civilian employees of the air force, and for custodians of non-appropriated funds of the air force, it clearly is a bank and banking institution by all of the foregoing definitions.

■ The provision of the Texas Banking Code prohibiting branch banking, cited above, has no application to the Carswell Air Force Base Facility of the Fort Worth National Bank. Such facility is not, and does not purport to be, a branch bank under 12 U.S.C.A. § 36. It is an arm and agency of the federal government. It was established by the Fort Worth National Bank under its designation as financial agent of the Government in accordance with the provisions of 12 U.S.C.A. § 90, which reads, in part, as follows:

"All national banking associations, designated for that purpose by the Secretary of the Treasury, shall be depositories of public money, under such regulations as may be prescribed by the Secretary; and they may also be employed as financial agents of the Government; and they shall perform all such reasonable duties, as depositaries of public money and financial agents of the government, as may be required of them. * * * "

The letter of January 20, 1948, from the Treasury Department to Mr. H. W. Peterson, Vice President, Fort Worth National Bank, authorized the establishment of the Carswell facility by the Fort Worth National Bank "under its designation as a Depository and Financial Agent of the Government".

As such it is an arm and agency of the Government, just as is a military post exchange. Military banking facilities and post exchanges are instituted and function in much the same way. In Standard Oil of California v. Johnson, 1942, 316 U.S. 481, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611, the Supreme Court held that post exchanges as arms of the Gov-

---

* (1) Filed September 6, 1957 under the caption "Defendant's Motion for Bill of Particulars and for Dismissal of Indictment".

(2), Filed July 12, 1957.

ernment were "integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes". To contend otherwise would be to contest, after nearly one hundred and fifty years, the right of Congress to establish a national bank, and any effort to control the operations, functions, and duties of a national bank in its capacity as financial agent of the Federal Government is an attempt to overrule McCulloch v. State of Maryland 4 Wheat. 316, 4 L.Ed. 579, and the multitude of decisions resting thereon.

The independence of an agency of the Federal Government, functioning within the scope of its authority, is illustrated by State of Ohio v. Thomas, 1899, 173 U.S. 276, 19 S.Ct. 453, 455, 43 L.Ed. 699, in which it is stated:

" * * * we think a state legislature has no constitutional power to interfere with such management as is provided by congress."

In James Stewart & Co. v. Sadrakula, 1940, 309 U.S. 94, 60 S.Ct. 431, 436, 84 L.Ed. 596, the Court in effect made the same decision in saying:

"The authority of state laws or their administration may not interfere with the *carrying out of a national purpose*. Where enforcement of state law would handicap efforts to carry out the plans of the United States, the state enactment must, of course, give way."

The operation of military banking facilities is clearly the carrying out of a national purpose, an area in which the authority of state laws or their administration may not interfere. Even if it were to be conceded, which it is not,

that the operation of these facilities constituted a technical violation of state law, the enforcement of such law would handicap efforts to carry out the plans of the United States, and the state enactment must give way.

It being evident that the Carswell Air Force Base Facility of the Fort Worth National Bank was a bank or banking institution within the meaning of Sec. 371, Title 18 U.S.C. defendant's motion to dismiss was denied.

Motion To Suppress Evidence

▪ The portion of the motion relating to suppression of evidence reads: "Defendant respectfully moves the court to instruct the United States District Attorney and any officers who expect to use any statements made by the defendant, any evidence gained through any information from the defendant, or any evidence gained as a result of conversations with defendant during the time defendant was illegally detained before being arraigned at the United States Commissioner's hearing, not to use same * * * that such evidence, if any, obtained by the law enforcement officers investigating the case to be the fruit of the illegal detention above referred to in this motion". The "illegal detention" was alleged to be for a period of approximately 44 hours between arrest on April 29, 1957 "around 6 o'clock p. m." until May 1 at 2 o'clock p. m., when taken before the United States Commissioner under Rule 5(a) Federal Rules of Criminal Procedure, 18 U.S.C.

Papworth was taken before a United States Commissioner within a very short time after the City of Fort Worth police officers turned him over to federal officers on May 1. Papworth was arrested[1] by and held in the custody of Fort

---

1. The FBI agents neither had instructions nor authorization to arrest him; did not seize or detain him and had no intention of arresting him. On the contrary the city policemen had orders to and did arrest Papworth, telling him at the time that they were arresting him; took him into their custody and took him with them to the city jail. Thus there

was "an actual * * * seizure or detention of the person" of the defendant Papworth "performed with the intention to effect an arrest and so understood by the person (Papworth) detained". Jenkins v. United States, 10 Cir., 1947, 161 F.2d 99, 101; Brinegar v. United States, 10 Cir., 1947, 165 F.2d 512, by the city policemen.

Worth city police for investigation of a suspected robbery of valuable oil paintings in the office of a Fort Worth multimillionaire, and suspicion of forgery as well as conspiracy to rob the Carswell bank facility, all of which were violations of state law, for which the City police officers had reason and authority acting in their capacity of agents of the City of Fort Worth and the State of Texas to arrest the defendant and take him into state custody. Papworth remained in city and state custody from the moment of his arrest until shortly before taken before the United States Commissioner.

■ While FBI agents first received and transmitted to city and state officers information concerning defendant's planned bank robbery and freely cooperated with those officers, the detention of defendant Papworth by state officers was not at the instance of federal officers.[2] The type of cooperation between state and federal officers existing in this case is proper in a government such as ours where we, the people of the United States, conduct our affairs under a federal system which places primary responsibility for police protection of the too rapidly diminishing law-abiding portion of our population upon the members of the federation—the states.

The aim of the motion to suppress is to exclude statements made by defendant Papworth to: (1) Fort Worth newspaper reporters at 7 a. m. on May 1, and to (2) the reporter for television station WBAP—TV recorded at 9 a. m. on May 1, and presented to the television audience on the "Texas News" program, in which Papworth admitted that he had a part in a plan to rob Carswell Air Force Base Facility; and particularly the re-run of Papworth's telecast in the presence of the jury. At the hearing on the motion, prior to trial, it was shown that on the afternoon of April 30 Papworth had made voluntary oral confession of his guilt to police and FBI officers, which when committed to writing he did not sign. However, on the trial

no confession or admission of guilt by Papworth to any law enforcement officer was offered in evidence.

Defendant made no claim or proof that his confession to officers or his admissions and incriminating statements broadcast to the public were made by reason of force, threats, compulsion, coercion, inducement or other improper means, defendant contending only that such admissions and incriminating statements were inadmissible because made during his "illegal detention" between 37 and 39 hours respectively after his arrest and between 7 and 5 hours respectively before his arraignment. Defendant contends that since the statements were made and broadcast by him after arrest and before he was brought before a United States Commissioner "without unnecessary delay" as required by Rule 5(a) of the Federal Rules of Criminal Procedure, that such statements were inadmissible. Defendant cites in support of his contention the following cases: United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48; Patterson v. U. S., 5 Cir., 183 F.2d 687, Mallory v. U. S., 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed. 1479.

As stated in these authorities, which in turn rest upon the teachings of McNabb v. United States, 318 U.S. 332, 343–344, 63 S.Ct. 608, 87 L.Ed. 819, as reaffirmed and explained in Upshaw v. U. S., 335 U.S. 410, 69 S.Ct. 170, 93 L. Ed. 100, and prior federal statutory provisions which resulted in the adoption of Rule 5(a) requiring arraignment "without unnecessary delay", the "important reasons of policy behind this body of legislation", were: "protection for the innocent * * * securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society * * * procedural requirement (which) checks resort to those reprehensible practices known as the 'third-degree' * * * to avoid all the evil implications of secret interrogation of persons accused of crime". [354 U.S. 449, 77 S.Ct. 1358.] None of these

2. As in Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829.

"reasons of policy" apply to the circumstances attending defendant Papworth's obviously voluntary television news broadcast to the public of admissions of a part in the planned bank robbery.

Papworth's telecast of admissions of a part in the planned robbery were not "the fruits of wrongdoing of government officers". The incriminating statements were not elicited through illegality. They were not "the product of the suction process of interrogation".[3] They were not wrenched from him in violation of constitutional safeguards of due process. They were not made "in *secret* interrogation", as in the Mallory case. On the contrary, the telecast demonstrates beyond all question that Papworth's story was an "expression of free choice, a statement * * * volunteered".[4]

Neither Rule 5(a) nor any of the cases applying the McNabb doctrine afford the defendant the right to broadcast incriminating statements to the world and require a court to keep them from a jury trying his case. Such an extension would overstep the "limits of realism and common sense".[5]

■ Two distinct reasons for overruling the motion are evident from the foregoing discussion: (1) The prisoner was not in Federal custody so the McNabb rule as to confession obtained during illegal detention does not apply, and the common law requirement of volun-

tariness was met. (2) Even if the McNabb rule should be regarded as controlling, it still would not exclude the public statements because they obviously were not the fruits of illegal detention or of secret interrogation.

■ Defendant further contended that the statements complained of were made without warning Papworth of his privilege against self-incrimination, that is that any statement might be used against him, and that Papworth was not advised of his right to counsel. In Powers v. U. S., 223 U.S. 303, at page 313, 32 S.Ct. 281, 283, 56 L.Ed. 448 the opinion states:

"In Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090, Wilson was charged with murder. Before a United States Commissioner upon a preliminary hearing, he made a statement which was admitted at the trial. He had no counsel, was not warned or told of his right to refuse to testify, but there was testimony tending to show that the statement was voluntary. At page[s] 623 [624 of 162 U.S., at pages 900 of 16 S.Ct.], this court said: 'And it is laid down that it is not essential to the admissibility of a confession that it should appear that the person was warned that what he said would be used against him, but, on the contrary, if the confession was voluntary, it

---

3. As in Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801.

4. Watts v. State of Indiana, supra.

5. For an especially discriminating and acute discussion of the McNabb doctrine see McCormick on Evidence, West 1954, pp. 246–248. Also, United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; White v. United States, 5 Cir., 1952, 200 F.2d 509, certiorari denied 345 U.S. 999, 73 S.Ct. 1142, 97 L. Ed. 1405, rehearing denied 346 U.S. 843, 74 S.Ct. 17, 98 L.Ed. 363, dealing with state custody, and Brown v. United States, 5 Cir., 1955, 228 F.2d 286. Also see: Joseph v. United States, 5 Cir., 1957, 239 F.2d 524, 527: "A confession, in short, is not made involuntary and inadmissible by the fact alone that it

was obtained before the defendant was taken before the commissioner. It must be shown, and the burden is on the defendant to show it, that the failure promptly to carry a prisoner before a committing magistrate, constituted unnecessary and, therefore, unlawful detention for the illegal purpose and with the illegal result of inducing the confession." To the same effect see also Patterson v. United States, 5 Cir., 1950, 183 F.2d 687 and Duncan v. United States, 5 Cir., 1952, 197 F.2d 935, certiorari denied 344 U.S. 885, 73 S.Ct. 185, 97 L.Ed. 685.

For an excellent annotation on the subject see also Ladd Cases and Material on Evidence, (Callaghan & Co. 1955) 482–494.

is sufficient, though it appear that he was not so warned. Joy, Confessions, * 45, * 48, and cases cited.'"

"Voluntary admissions, or indeed, voluntary confessions, may be received in evidence against the giver without proof of warnings." Himmelfarb v. U. S., 9 Cir., 175 F.2d 924, at page 938. "The relevant inquiry ought always to be whether the testimony was freely given, all things considered." United States v. Block, 2 Cir., 88 F.2d 618, at page 621. To the same effect, 4 Barron Federal Practice & Procedure § 2175 at p. 204; 22 C.J.S. Criminal Law § 730.

Accordingly, the defendant's motion to suppress was overruled and the statements were admitted.

### Motion For Bill Of Particulars

The motion for bill of particulars was general in terms. No authority in its support was presented by competent counsel for the defendant. The motion, being without merit or substance, was denied.

### Motion To Instruct The Government To Produce Records

#### Jencks Case and Title 18 U.S.C. New Section 3500

Defendant's motion to instruct the government to produce records was heard and denied on September 14, 1957, nine days prior to this trial. In that hearing the defendant relied upon Jencks v. U. S., June 1957, 353 U.S. 657, 77 S. Ct. 1007, 1 L.Ed.2d 1103 in urging that the government be required to produce its record of oral and written reports made by an informer to the FBI, as such reports were relevant, competent and necessary instruments for the defendant to use in the preparation of his defense.

The prosecution has urged, and it is the Court's opinion that defendant's rights are governed by Section 3500, and not by the Jencks decision. However, since the defendant relies primarily on the Jencks case, the first analysis will be concerned with the applicability of the Jencks decision to the facts of this case.

The United States Supreme Court stated its decision in the Jencks case as follows, 353 U.S. at page 668, 77 S.Ct. at page 1013:

"We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the FBI, touching the events and activities as to which they testified at the trial. We hold, further, that the petitioner is entitled to inspect the reports to decide whether to use them in his defense."

The Jencks case stands for a rule with reference to impeachment of a witness. The witness cannot be impeached until he has testified. Prior to the trial of the case, the government does not know definitely which witness it will call. A portion of the Jencks opinion illustrating this point is (353 U.S. at pages 666, 667, 77 S.Ct. at page 1012):

"The necessary essentials of a foundation, emphasized in that opinion (Gordon v. U. S., 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447) and present here are that '[t]he demand was for production of * * * specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up. Nor was this a demand for statements taken from persons or informants not offered as witnesses.'"

This position is sustained by the opinion of Judge Edmund L. Palmieri of the Southern District of New York in United States v. Benson, 20 F.R.D. 602, and by the case of Simms v. United States, D.C.Cir., 248 F.2d 626.

Few cases have been subject to such varied interpretation and popular misunderstanding as the Jencks case. The United States Senate Report No. 981, August 15, 1957, U.S.Code Congressional and Administrative News, pp. 1861–1870, discloses some of the interpretations:

At page 1862

"For example, on July 2, 1957, an attorney for a defendant being prosecuted by the Department of Justice in the Southern District of Texas, wrote to the United States Attorney for that district asking that the entire government file be mailed to him or that he be permitted to examine it at some convenient place. In fact, the Committee was advised by the Attorney General that the trial judge instructed the United States Attorney to turn over the entire investigative file for examination by the defense prior to the trial.

At page 1863

"There was a case in the United States Court of Appeals for the Third Circuit United States v. Rosenberg, 245 F.2d 870 in which the circuit judges, on June 26, 1957, interpreted the opinion in the Jencks case as requiring a trial judge to permit counsel for the defendant to inspect at the trial the grand jury testimony of the witness as well as the statement of the witness to the FBI.

At page 1868

"In an opinion by the United States Court of Appeals for the Third Circuit the judgment of conviction in the Eastern District of Pennsylvania was reversed and a new trial ordered. The case involved the transportation in interstate commerce of a check obtained by fraud. The principal government witness had made a detailed statement to the FBI before trial. The trial judge denied a pretrial motion by the defense for leave to examine the testimony of the witness before the grand jury and his statement to the FBI. During trial the testimony and statements were produced for examination by the trial judge in camera, who indicated to counsel for the defendants wherein the witness's testimony in court differed.

The defendant's attorney was not permitted to examine the testimony. The court of Appeals based its reversal on the failure of the trial judge to permit the defense to inspect the Grand Jury testimony and statements, relying on the Jencks decision. (U. S. v. Joel Rosenberg, 3 Cir., June 26, 1957, 245 F.2d 870).

"It should be noted that grand jury testimony is protected from disclosure by a Federal Rule of Criminal Procedure, 6(e), and it is within the discretion of the trial judge to decide when grand jury testimony is to be revealed to the defense after a proper foundation is laid. Jencks makes no reference to this rule and such a disclosure was not mentioned directly or indirectly in the opinion."

Justice Clark in his dissenting opinion issued a forewarning as to the effect of the rule of the Jencks case, 353 U.S. at page 681, 77 S.Ct. at page 1020:

"Unless the Congress changes the rule announced by the Court today, those intelligence agencies of our government engaged in law enforcement may as well close up shop for the Court has opened their files to the criminal and thus afforded him a Roman holiday for rummaging through confidential information as well as vital national secrets."

While it has been argued that the Jencks decision had no such broad effect, but actually only required the government to produce documents or reports for the defendant to examine for impeachment purposes on cross-examination after the witness had testified, the reports of "incidents" of Jencks demands were so varied and widespread that Congress acted swiftly. The words of Justice Clark "unless the Congress changes the rule * * *" were not ignored. The Jencks decision was handed down June 3, 1957. On September 2, 1957 Chapter 223 of Title 18 U.S.C. was amended by adding a new section 3500.[6]

6. "§ 3500. Demands for production of statements and reports of witnesses

"(a) In any criminal prosecution brought by the United States, no state-

In the determination of the questions arising from the application of the Jencks theory and Section 3500 to the facts of this case certain dates should be noted: 1) the alleged conspiracy was between March 2, 1957 and April 30, 1957; 2) the hearing on defendant's motion was September 14, 1957; 3) the trial was begun on September 23, 1957. Under the theory of the Jencks case is the defendant entitled to inspect the reports in the possession of the government prior to trial? This question has been answered by Judge Moore in United States v. Anderson, D.C.E.D.Mo., 154 F. Supp. 374, 375, which is set forth at p. 14,552 of the Daily Congressional Record of August 26, 1957:

ment or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of

"(1) Before the Defendant in a criminal cause is entitled to production and inspection of a statement made by a person other than himself in the possession of the United States—(a) such person must have been called as a witness by the United States, (b) the Defendant must establish on cross examination that a statement was made by such witness, (c) that such statement is in the possession of the United States, and (d) that such statement touches the events and activities related in his direct examination.

"(2) Such statement must either have been (a) written by the witness himself, or, (b) recorded by

the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement', as used in subsections (b) (c) and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

someone acting for the United States.

"Category (b) includes only continuous, narrative statements made by the witness recorded verbatim, or nearly so, by persons acting for the United States, and does not include notes made during the course of an investigation (or reports compiled therefrom) which contain the subjective impressions, opinions or conclusions of the person or persons making such notes."

This Court is in accord with Judge Moore's interpretation of the Jencks decision. Therefore defendant's motion to inspect documents prior to trial was denied.

After the trial was begun, and the informer placed upon the witness stand, is Section 3500 of Title 18 applicable to the proceeding notwithstanding the fact that its enactment followed the making of the statements in question? The informer testified as a government witness. On cross examination defendant's counsel brought out the fact that numerous oral statements had been made to an agent of the FBI and that portions of such statements had been recorded by the FBI agent in the presence of the witnesses. Defendant's counsel then renewed his motion for inspection of the reports in the FBI files. The agent who took the statements testified that he had recorded in a small notebook, in the presence of the informer, the substance of what the informer had told him on the various occasions. Since Section 3500 has superseded Jencks defendant's rights must be determined under the new statute.

The alleged offense was committed, or the cause of action arose, prior to the enactment of the new statute. It is a well settled principle of law that statutes relating to procedure operate retroactively, and may apply even though the offense was committed prior to the enactment of the statute. 82 C.J.S. Statutes § 421, p. 996. The Su-

preme Court of the United States so held in Thompson v. State of Utah, 1898, 170 U.S. 343, 351, 18 S.Ct. 620, 623, 42 L.Ed. 1061, 1067:

"* * * so far as mere modes of procedure are concerned, a party has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose. The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime."

More recently the United States Emergency Court of Appeals in Dargel v. Henderson, Em.App., 1952, 200 F.2d 564, 566 reaffirmed the rule laid down in Thompson v. State of Utah, supra, holding that:

"* * * changes in procedural or remedial law are generally to be regarded as immediately applicable to existing causes of action and not merely to those which may accrue in the future unless a contrary intent is expressed in the statute."

The following cases also support the general rule stated above: Thompson v. State of Missouri, 1898, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204; Hallowell v. Commons, 1916, 239 U.S. 506, 36 S. Ct. 202, 60 L.Ed. 409; Beatty v. United States, 8 Cir., 1951, 191 F.2d 317, 320; United States v. Fullerton, D.C.Mass. 1949, 87 F.Supp. 359, 362; Ohlinger v. United States, D.C.S.D.Idaho 1955, 135 F.Supp. 40, 42.

■ It is equally well settled that the ex post facto clause of the Constitution, Art. 1, § 10, precludes the retroactive application of any substantive statute that increases the punishment or changes the ingredients of the offense between the time of its commission and the time of the trial. The determinative question is: what is "procedural" and what is "substantive"? "Procedure" has been said to be a comprehensive term, generally defined as including "evidence". See 2 Moore's Federal Practice 24. The American Law Institute in its Restatement of Conflict of Laws (1934) classifies rules of evidence as procedural in nature.

■ The retroactive application of statutes in regard to the admissibility of evidence was upheld in Thompson v. State of Missouri, 1898, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 and Hopt v. People of Territory of Utah, 1883, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262.

From these and many other cases it may be concluded that a statute which controls the admissibility in evidence of certain statements relevant only for the purpose of impeachment is "procedural" and not "substantive" in nature, for it does not increase the punishment nor change the ingredients of the offense or

the ultimate facts necessary to establish guilt, but, leaves untouched the nature of the crime and the amount and degree of truth essential to conviction. Senate Report No. 981, supra, makes it evident that the Senate Committee considered Section 3500 to be procedural:

At p. 1862:

"The Committee is convinced that the proposed legislation *which is procedural in character* if enacted, will serve both to protect individual rights during criminal prosecutions and to protect confidential information in possession of the government. It will also be effective in correcting widespread misinterpretations and popular misunderstanding of the opinion in the Jencks case, many instances of which have been revealed to the Committee since the decision was handed down."

■ That the admissibility of evidence is a matter of procedure is established by its presence in the Federal Rules of Criminal Procedure as Rule 26.[7] The rule recognizes the authority of Congress to legislate on the "admissibility of evidence". Where they have not so legislated the Supreme Court has the power to establish standards of procedure and evidence.[8]

---

7. This rule was based on Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136, and Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617.

8. Sheldon v. Sill, 8 How. 441, 49 U.S. 441, 12 L.Ed. 1147: "In the case of Turner v. Bank of North America, 4 Dall. 8, 10, 1 L.Ed. 718, * * * the court said: 'The political truth is, that the disposal of the judicial power (except in a few specified instances) belongs to Congress; and Congress is not bound to enlarge the jurisdiction of the federal courts to every subject, in every form which the Constitution' (Article III) 'might warrant.' "
In Mason v. Hitchcock, 1 Cir., 1939, 108 F.2d 134, 135, the court said: "Every federal court, other than the Supreme Court, derives its jurisdiction wholly from the authority of Congress. Kline v. Burke Const. Co., 260 U.S. 226,

43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077."
See also annotations in Cases and Materials on Federal Courts, McCormick and Chadbourn, 1957, pp. 7–11.
McNabb v. United States, 318 U.S. 332, at page 340, 63 S.Ct. 608, at page 613: "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of *procedure* and *evidence*. * * *
"The principles governing the admissibility of evidence in federal trials have not been restricted, therefore, to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts, see Nardone v. United States, 308 U.S. 338, 341, 342, 60 S.Ct. 266, 267, 268, 84 L. Ed. 307, this Court has, from the very beginning of its history, formulated rules

Thus Section 3500 of Title 18 is applicable to the proceedings now before the Court, notwithstanding the fact that it was enacted following the making of the statements in question, and the defendant's rights to inspect and examine the statements are determined by the statutes.

█ The "substance" of the statements of the witness Taylor were first recorded by the FBI agent in a handwritten notebook during his interview with Taylor. The entries of the FBI agent in his notebook will hereafter be referred to as the Taylor notes. The Taylor notes were thereafter typewritten exactly as they appeared in the notebook. On May 15, 1957, two weeks after the defendant was arrested, a formal report of the entire case covering an investigative period commencing March 26 and ending May 9, 1957 was prepared by the FBI. In addition to information obtained from Taylor, the formal report included a summary, conclusions and matters not recorded contemporaneously with interviews with the witness Taylor. Both the witness Taylor and the FBI agent testified that the Taylor notes were made during the conversation and the FBI agent specifically stated that the notes contained the substance of the information given to him by the witness. If such statements are included within the definition of the term "statement" in Section 3500(e) (2) they must be delivered to the trial court for examination in accord with Section 3500 (c), and the relevant portions delivered to the defendant for his inspection and examination. Section 3500(e) (2) defines the term "statement" as follows:

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the government and recorded contemporaneously with the making of such oral statement."

Are the government's Taylor notes, the typewritten copy thereof, and the formal FBI report subject to production on this motion of the defendant? Since both the informer and the FBI agent testified that the witness' statements were recorded in the small notebook at the time of the conversations such recordation would meet the requirement of being recorded contemporaneously. Taylor testified that his statements were recorded in his presence by FBI agent Madland. Agent Madland testified that the notes he made of Taylor's statements were not "word for word" recordings as he did not take shorthand, "and other than that it would be verbatim, the substance of what is in there is". These notes met the statutory requirement of a "substantially verbatim recital of an oral statement" of Taylor. The original notes in the notebook and the verbatim typed copy are subject to inspection by the defendant. But, the FBI agent's small notebook contained much other confidential information, much of which was wholly unrelated to this case. The defendant has no right to examine such material. Such being the case, the Court is bound by Section 3500(c) to order the United States "to deliver such statements for the inspection of the court * * * and the court shall excise the portions of such statements which do not relate to the subject matter of the testimony of the witness".

The above mentioned FBI notes and reports were delivered to the Court for its inspection and they were inspected by the Court in camera, and the Court determined what portion was relevant and usable for impeachment and what portion was admissible under the statute as a "statement". This involved, of course, the time-consuming task of checking and reading the hastily written FBI notes, checking the accuracy of the verbatim typed copy thereof, and inspection of the entire FBI formal

of evidence to be applied in federal criminal prosecutions. * * * see 1 Wig-

more on Evidence (3d Ed. 1940) pp. 170–97; Note, 47 Harv.L.Rev. 853."

854

report. The relevant portions of the original notebook and the verbatim typed copy of the original notes were delivered to the defendant for his use in cross examining the witness.

The full FBI report prepared May 15, 1957, was obviously not "recorded contemporaneously" and since the defendant received the statements of the witness in the Taylor notes the delivery of the formal report to the defendant was denied.

This holding is believed to be in accord with congressional purpose in passing the new statute, as expressed by Senator Javit, which appears in the Congressional Record for August 29, 1957, at page 15,054:

"As a practical matter, then, what has been done with the so-called records provision is to tie it down to those cases in which the agent actually proports to make a substantial verbatim recital of an oral statement that the witness has made to him—not the agent's own comments or a recording of his own ideas, but a substantially verbatim recital of an oral statement which the witness has made to him, and as transcribed by him, is that correct?

"Mr. O'Mahoney: Precisely."

There can be little doubt that Congress intended to protect from discovery all memoranda and general reports prepared by government agents summarizing the progress and results of their investigation and production of such oral statement is required only where the statements were recorded contemporaneously and written down substantially verbatim. This intent is effectuated by the interpretation placed on Section 3500 in this case. Any other interpretation of the Act would do violence to the intent of Congress.