James E. PAPWORTH, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16943.

United States Court of Appeals Fifth Circuit.

May 15, 1958.

Rehearing Denied June 27, 1958.

James E. Papworth, in pro. per.

Heard L. Floore, U. S. Atty., W. B. West, III, Asst. U. S. Atty., Fort Worth, Tex., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a conviction of appellant for conspiracy to rob the Carswell Air Force Base facility of the Fort Worth National Bank. It presents two principal questions. The first is whether certain admissions made while appellant was being held in the Fort Worth City jail before arraignment were properly admissible against him. The second is the application of the Jencks case rule, Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, to the FBI reports in this case. The full and able opinion of the trial court is published in

United States v. Papworth, D.C., 156 F. Supp. 842.

In late March, 1957, an informer, Taylor, told the FBI that appellant had approached him for cooperation in the robbing of the Carswell Air Force Base banking facility on the occasion of a semi-monthly deposit there of some $400,000 of cash for the cashing of paychecks. The FBI asked Taylor to keep them informed. Plans proceeded until Taylor reported that a well-known gunman Norris and another unidentified man would commit the actual robbery on April 30th; that he had furnished the conspirators with a plan of the bank and that they planned to go to the residence of a woman employee who had a key to the facility, take her son and either kidnap or kill her and get her key and automobile that had a sticker to gain them access to the base; that they were prepared to kill the bank employees and "blast" their way out after the robbery. Taylor then reported that the conspirators would hold a rehearsal or "dry run" over the escape route on the afternoon of April 29th. The FBI had meanwhile informed City of Fort Worth police officers and the county sheriff and Texas state rangers of all they knew. They held several conferences at which it was repeatedly stated by the FBI agents that the United States Attorney would not authorize an arrest and that they had no power to make an arrest, but that both city and state police officers stated they could and would make an arrest at the time of the rehearsal. For several days prior to April 30th continuous surveillance was maintained by all three enforcement groups over appellant, Taylor and Norris. Taylor's reports were carefully corroborated. The state and city police officers undertook to set up a road block at a point on the escape route as outlined to them by Taylor.

At the appointed time appellant Norris and the third man, later identified as Humphrey, were seen in two cars, one belonging to appellant and one to Norris; they approached the base and then left along the escape route but Norris left

appellant's automobile and got into the car with Humphrey. The FBI agents followed appellant to his home. In the meantime, city and state officials having orders from the chief of police to "pick up" Norris on sight, followed his car. The car sought to evade the police and a chase ensued with both cars going in excess of 100 miles an hour. There was a gunfight, the Norris car was wrecked, and in the fight that followed both Norris and Humphrey were shot and killed. At this time the city police chief by radio ordered the arrest of appellant at his home.

Two FBI agents who followed appellant saw him come out of his home with his wife; they approached him, identified themselves and asked him if he would talk to them. He asked if he was under arrest and they told him he was not but asked him to talk to them in their car, which he did. They did not know the city police had been notified to arrest him. When they had talked to him inconclusively some 15 to 30 minutes, three city police officers drove up and said they were sent to arrest him. They did so, and the FBI agents handed over to the city officers appellant's wallet which he had voluntarily handed one Federal agent when he asked for identification

Appellant was taken to the City Hall, which also houses the city police department and jail, and was signed in at 6:45 p. m. The arrest card showed he was arrested for "investigation." He was not then nor at any time later, taken before a state magistrate, but on May 1st, at 1:45 p. m. he was taken by the city police to the office of the United States Commissioner, and there turned over to the Federal officers for arraignment on the Federal charge of conspiracy of bank robbery.

The appellant did not testify either on the trial or on the voir dire to determine the merits of his motion to suppress evidence of his admissions while at the city jail. Thus the testimony of the officials is undisputed to the following effect: he was first questioned at about 10:30 a. m. on the 30th by police officers and

FBI agents, who requested police permission to interview them. He was told of his constitutional rights not to answer and to have counsel; he was offered no rewards and was subjected to no threats. There were three interviews, the first about 45 minutes which produced nothing damaging to appellant; the second at 4:00 p. m. for an hour in the office of the chief of police and thereafter, after being told of the death of Norris and Humphrey, from about 6:00 p. m. to 10:30 p. m., during which he made a statement that was written down but not signed by him. No evidence as to any admissions made by him at any of these three periods of interrogation was introduced at the trial.

On the following morning, at 7:00 a. m., three newspaper reporters requested and received permission to interview appellant, which they did with no police officer present. They returned at 9:00 a. m. with moving picture camera and sound recording equipment to obtain material from him for a television broadcast. On this occasion the chief of detectives was present but did not participate in the questioning. This interview was broadcast locally on May 1st and it was played off to the jury on the trial, over objections of appellant.

At the proper time, before the trial, appellant made a motion to suppress any evidence "gained as a result of a conversation with the defendant during the time the defendant was illegally detained before being arraigned at the United States Commissioner's hearing."

At the conclusion of this hearing the trial court found that Papworth was not in federal custody, but was held solely by state officers in the investigation of suspected state offenses; his arrest was not at the instigation of the federal officials. The court also found that Papworth did not even contend that he had been subjected to "force, threats, compulsion, coercion, inducement or other improper means." See United States v. Papworth, D.C., 156 F.Supp. 842, 846. So finding, the court concluded the motion to suppress was without merit.

Appellant here, relying on McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Rule 5(a), F.R.Crim.P., 18 U.S.C.A., and the recent Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479, decision, says the arrest was induced by the Federal agents and that there then came into play all the requirements of Rule 5(a) and the failure of the government to take Papworth forthwith before the United States Commissioner invalidated any admissions made by him while held by the state officers.

The courts have become increasingly tender towards the protection of the accused from all dangers inherent in secret interrogation before arraignment and any kind of "third degree" methods looking towards the obtaining of confessions. Certainly it is abundantly clear that if federal officials arrest without a warrant a suspect who is ill advised as to his rights, they then subject him to intense examination over protracted periods before taking him before a magistrate for arraignment, and as a result of such pre-arraignment questioning, a confession is obtained which then becomes the basis of his commitment, the admission so obtained would be suppressed under the Mallory decision. In that case the Supreme Court placed its decision squarely on the statute embodied in Rule 5(a), saying:

> "The requirement of Rule 5(a) is a part of the procedure devised by Congress for safeguarding individual rights without hampering effective and intelligent law enforcement. Provisions related to Rule 5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest available magistrate. * * *"

and further:

> "The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere

suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt." Mallory v. United States, 354 U.S. 449, 453, 454, 77 S.Ct. 1356, 1359.

That there is not complete agreement by the courts as to the outer limits of the Mallory decision is apparent from the five different opinions of the Court of Appeals for the District of Columbia Circuit in Trilling v. United States, D.C. Cir., —— F.2d ——, and cf. Watson v. United States, 101 U.S.App.D.C. 350, 249 F.2d 106. However, it is clear that the local police officers did, as to Papworth, commit acts which, had the entire matter been within exclusive federal control, would have tainted any admissions made to the officers with invalidity. However, the Government points out no such admission was tendered. What was tendered and admitted against Papworth was his own "voluntary" statement to reporters, which, while still made in the jail, was made out of the presence of any officers. Of course, this public statement was made to reporters by Papworth after public announcement by the police of Papworth's admission to them. It must also be said that the admissions by Papworth were the only evidence on which a federal charge could be successfully based other than that supplied by Taylor, which the FBI had previously insisted was not "sufficient basis for an arrest." Thus it can be said that the admission made by Papworth while being held under circumstances that would have been illegal under Federal rules was truly the basis of the charge against him. This, we think, would condemn the use of such admission if procured during federal detention following questioning by federal agents.

What different rule applies when the arrest and detention is made by state officers and the confession or admission is made to them? We think there is adequate support for the trial court's finding that the arrest was by the state officers without inducement by the FBI agents, and that therefore the detention was state and not federal detention. There was thus no requirement, since there was no opportunity, for the federal agents to take Papworth before the United States Commissioner until the state officers made him available for that purpose. There is no complaint that once actual custody was turned over to the federal agents there was any delay in the arraignment.

We have heretofore passed on this question several times. In White v. United States, 5 Cir., 200 F.2d 509, 512, certiorari denied 345 U.S. 999, 73 S.Ct. 1142, 97 L.Ed. 1405, involving burglary of a United States Post Office, questioning was done by a postal inspector during several days of confinement in the city jail without a warrant and without commitment. This questioning resulted in a confession by the accused. In that case we said:

"  *  *  *  Before the question is reached of whether there was unnecessary delay in taking the defendant before a United States Commissioner, it must first be determined that a federal officer, here Mr. Shubert the Post Office Inspector, had the custody and control of the defendant. The Birmingham City Detectives showed a very high degree of cooperation with and assistance to the Post Office Inspector. Both Mr. Jones and Mr. Shubert testified orally and the inferences and conclusions to be drawn from their testimony so far as the same relate to the admissibility of this evidence were primarily for the District Judge. He had the ad-

vantage of seeing and hearing the witnesses. If he believed their testimony to the effect that the defendant was being held under a state charge of burglary and grand larceny on instructions from the Detective Bureau of the City of Birmingham, and that his custody was not turned over to the federal officer until shortly prior to the time that he was carried before the United States Commissioner, then the evidence would not be inadmissible under the McNabb Rule. * * " White v. United States, 200 F.2d 509, 512.

In Brown and Hogue v. United States, 5 Cir., 228 F.2d 286, appellants were convicted of bank robbery partially on a confession made to federal agents who interrogated them while they were held by state officers for several days without having been arraigned. We there said:

"The most serious question is whether, under the McNabb Rule (McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819), admission of the confessions should be denied because obtained before prompt arraignment. This Court has expressed its understanding of the reason for the McNabb Rule as 'to abolish unlawful detention by or at the instance of federal officers and to require observance of Rule 5(a) Federal Rules of Criminal Proceduce.' White v. United States, 5 Cir., 200 F.2d 509, 512, 513. The McNabb Rule is inapplicable when the unlawful detention is by State officers not acting in collaboration with federal officers. Anderson v. United States, 318 U.S. 350, 355, 356, 63 S.Ct. 599, 87 L.Ed. 829; White v. United States, supra; United States v. Harris, 7 Cir., 211 F.2d 656, 660." 228 F.2d 286, 289.

We think these decisions are not in conflict with Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 602, 87 L.Ed. 829, in which case the Supreme Court said:

"There was a working arrangement between the federal officers and the sheriff of Polk County which made possible the abuses revealed by this record," [repeated and insistent questioning by federal officers over a five or six day period resulting in confessions to them when the accuseds were held without a warrant by state officers in the "hostile atmosphere of a small company-dominated mining town"].

We think on the facts as found by the trial court on this preliminary question, the admissions here introduced do not fall within the condemnation of the Mc-Nabb-Mallory rule.

■ We next come to appellant's contention that he was entitled to all of the FBI recordations of Taylor's oral reports (he made no statements in writing) and also the FBI report made 15 days after the arrest summarizing the entire investigation. While Taylor was under cross examination, he testified that he had made a report to the FBI following every contact with Papworth. He stated that when he reported in person the agent took down notes of his conversation and the agent testified, outside the presence of the jury, that he did the same thing when he received telephone reports. He said he could not take shorthand, but wrote down the highlights of the conversation. The government produced in court the original notebook kept by the agent and the latter testified that he had made up a typewritten transcript of all the notes relating to Taylor. The government contended that since this was not a "substantially verbatim recital" of Taylor's oral statements that this transcript, marked Exhibit B, should not be delivered to appellant's counsel. The court held that Exhibit B met the statutory requirement [1] of a "substantially verbatim recital" of an oral statement.

---

1. 18 U.S.C.A. § 3500(b) and (e) (2).

**130**

Without attempting to determine whether the statute adopted subsequent to the Jencks decision has the effect of limiting what would otherwise be required by that decision [2] we agree that Exhibit B met the requirements of the statute and the language of the Jencks opinion.

We also conclude that a report made two weeks later by the FBI agents, which included a running summary of the investigation in the language of the agent who prepared it is neither the "substantially verbatim recital of an oral statement * * * recorded contemporaneously with the making of such oral statement", as required by the statute, nor is it a "report * * * orally made, *as recorded by the FBI*," as required under the Jencks decision. The court correctly ruled that the government need not produce the report which was properly identified and produced before us as required by the statute, 18 U.S.C.A. § 3500.

We have carefully considered appellant's other grounds of appeal but find no merit in them and do not consider that discussing them separately would be warranted in light of the necessity of the lengthy discussion of the two principal grounds.

The judgment is affirmed.

2. "We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its pos-

session, written and, *when orally made, as recorded* by the FBI, touching the events and activities as to which they testified at the trial." (Emphasis added)

353 U.S. 657, 668, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103. There is no limitation here to "substantially verbatim recital."