## Commonwealth *v.* Scoleri, Appellant.

112

Argued October 15, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, ▮ JJ.; reargued January 14, 1960. Before JONES, C. J., MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

▮▮▮ reargument refused April 19, 1960.

*Michael von Moschzisker,* with him *von Moschzisker, Bradley and Carroll,* for appellant.

*Paul M. Chalfin,* First Assistant District Attorney, with him *Domenick Vitullo,* Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 4, 1960:

Anthony "Tony" Scoleri, the appellant, and his brother, Joseph "Eddie" Scoleri,[1] were charged in a

---

[1] "Eddie" Scoleri entered a plea of guilty to murder generally; his crime was fixed as murder in the first degree and he was sentenced to life imprisonment.

bill of indictment by the grand jury of Philadelphia County with the murder on August 28, 1958 of one Max Gordon. After a trial before Judge Vincent A. Carroll and a jury the appellant was found guilty of murder in the first degree and the penalty fixed at death. On June 23, 1959,—appellant's new trial motion having been denied,—appellant was sentenced to death; from that judgment of sentence this appeal was taken.

On August 28, 1958, Max Gordon operated a "notions" store at the southwest corner of Newkirk and Reed Streets, Philadelphia. This store was located on the first floor of the premises and in the rear thereof was a kitchen; in the basement was a recreation-living room; on the second floor were the living quarters of the Gordon family which consisted of Max Gordon, his wife, Rose Gordon, and their 17 year old daughter, Sheila Gordon.

At approximately 8 :40 o'clock in the evening of that date, two men, both armed and masked,[2] entered Gordon's store through the front door. Gordon and his wife were then in the kitchen; Sheila Gordon and her friend, Jack Dinerman, were watching television in the basement recreation room. Gordon was struck with a blunt instrument on the head, the blow causing him to fall to the kitchen floor although he was not rendered unconscious; Mrs. Gordon fainted and fell to the floor. The "taller" man guarded Mr. and Mrs. Gordon with a gun while the "shorter" man went down to the recreation room and ordered Sheila Gordon and Dinerman to the first floor. The "taller" man guarded both Gordons and Dinerman in the kitchen with a gun while the "shorter" man forced Sheila Gordon to accompany him to the second floor where he searched for money or other valuables. Upon their return to the kitchen both

---

[2] One man, described as the "shorter" man, wore a "stocking" mask which partially covered his face; the other man, described as the "taller" man, held a white handkerchief in front of his face.

Dinerman and Sheila Gordon were ordered to lie or crouch on the floor while the two men forced Max Gordon at gunpoint from the kitchen into the store. While in the store a gun battle ensued during the course of which appellant—at trial identified as the "shorter" man—was observed shooting at Max Gordon; Max Gordon received three gunshot wounds in his body[3] and Richard "Ricky" Woods—identified at trial as the "taller" man—received a stomach wound.[4] Both hold-up men then ran from the premises.

During the course of the hold-up the men removed a ring from Mrs. Gordon's finger, some items of jewelry from the second floor bedroom, $14 from Dinerman's wallet and a small amount of money from the store's cash register. In addition to operating a "notions" store, Max Gordon also cashed checks and issued money orders for the American Express Company and several American Express Company orders were found missing.[5]

There was definite and certain identification of both men who took part in this affair.[6] Dinerman identified the "shorter" man as "Tony" Scoleri and testified that it was he who removed the money from his (Dinerman's) wallet and it was he who was observed shooting at Max Gordon in the store. From a photograph Dinerman also identified the "taller" man,—a "light skinned negro"—as Richard "Ricky " Woods. Sheila

---

[3] Gordon died as the result of these wounds shortly after his arrival at the hospital.

[4] Max Gordon had a gun behind the store counter and it appears that it was he who shot Woods.

[5] Denise Devonshire testified that she saw appellant, after the hold-up, burn papers among which were some upon which the name "American Express" appeared

[6] In this connection it is our duty to view the evidence in the light most favorable to the Commonwealth: *Commonwealth v. Gates*, 392 Pa. 557, 559, 141 A. 2d 219; *Commonwealth v. Wright*, 383 Pa. 532, 536, 119 A. 2d 492.

Gordon confirmed Dinerman's identifications. Dr. Norman Kushner, standing outside his office,—located directly across the street from Gordon's store—observed the two hold-up men leave the store and identified "Tony" Scoleri as one of the men. David Tupper and Joseph Sannasardso, two youngsters who pursued the two men in their flight down the street subsequent to the hold-up, identified "Tony" Scoleri as one of the men.

After these men left Gordon's store they ran south along the westerly side of Newkirk Street until they reached Dickinson Street; at that point they turned right and ran to 29th Street—less than a city block west of Newkirk Street—where they entered a 1955 Chevrolet two door sedan operated by "Eddie" Scoleri. Woods, the wounded "taller" man who had fallen several times en route to this point, was helped into the car by appellant. A number of youngsters who happened to be in the neighborhood pursued the two men until they drove away in the car; during this pursuit, "Tony" Scoleri fired his gun at the youngsters.

Both Scoleris and Woods went directly to the apartment of one Ida Iocco, "Tony" Scoleri's girl friend, arriving there at approximately 9 o'clock p.m. Denise Devonshire and Harry Shinock, who were in the Iocco apartment at that time, saw Woods carried into the apartment by the Scoleris and placed in the bedroom where he subsequently died, no medical care having been summoned. Several days later Scoleris took Wood's body to New Jersey where they buried it in a shallow trench.

On August 30, 1958 the Scoleris and Ida Iocco went to New Jersey; after arranging for "Eddie" Scoleri's 1955 Chevrolet sedan to be repainted, they took an automobile belonging to Pat Scoleri, a brother of "Tony" and "Eddie", and went to West Virginia where they stayed with some friends. From one of these friends,—

John Loving—they borrowed an automobile and proceeded to Cleveland where they stole another automobile. While in Cleveland, at "Tony" Scoleri's direction, "Eddie" Scoleri and Ida Iocco had their hair dyed and "Tony" Scoleri, who ordinarily wore eyeglasses, ordered contact lenses. They then went to Chicago and, while there, Ida Iocco was burned under mysterious circumstances and had to be hospitalized. Both Scoleris then left Chicago and went to Kansas City, Missouri, where they were apprehended at gun-point by Kansas City police officers.[7] During the entire flight both Scoleris used fictitious names.

Shortly after the commission of the hold-up both Scoleris, in each other's presence, related to Ida Iocco how "Tony" Scoleri and Woods had entered Gordon's store and committed the hold-up and that "Eddie" Scoleri drove the get-away car, "Tony" Scoleri stating that he had "shot at Max Gordon". The bullet which fatally wounded Woods was traced to Max Gordon's gun. "Tony" Scoleri's gun was never recovered; however, there was evidence that, prior to, during and subsequent to the hold-up, "Tony" Scoleri had in his possession a .32 calibre automatic gun and the autopsy on Max Gordon's body revealed the presence of two .32 calibre bullets.

Appellant's defense was an alibi supplemented by testimony that, as the result of an ankle injury sustained 10 days prior to the date of the hold-up, his ability to walk was so impaired that he could not have run from Gordon's store as testified by certain Commonwealth witnesses.

"Eddie" Scoleri testified that "Tony" Scoleri had not taken part in the hold-up. His testimony was that Joseph "Yogi" Santarpio and Woods were the two men

---

[7] "Tony" Scoleri drew a gun which he threw to the ground when "covered" by the officers' guns.

who committed the hold-up and shot Max Gordon and that he, under compulsion of Woods and Santarpio, acted as the driver of the get-away car. After the hold-up "Yogi" Santarpio left them, and "Eddie" Scoleri, while driving the wounded Woods, happened to see his brother "Tony" Scoleri on the street and persuaded him to drive them to the Iocco apartment.[8]

The Commonwealth, in rebuttal, called (1) F. M. Caraker, appellant's parole officer, who testified that on two occasions—two days prior to and the day subsequent to the hold-up—he had seen appellant and noticed nothing unusual in his manner of walking and (2) five witnesses all of whom testified that "Yogi" Santarpio[9] was with them working in a garage at the time of the robbery.

Appellant contends that he is entitled to a new trial on three grounds: (1) that the trial court's action in proceeding with the trial, in view of appellant's physical and mental condition, was highly prejudicial; (2) that the trial court erred in its instructions to the jury on reasonable doubt and the defense of alibi; (3) that the passage by the General Assembly of Act 594 of 1959, approved December 1, 1959, which provides for a "split verdict" trial in homicide cases, compels a new trial.

During the course of the trial[10]—at approximately 5:25 a.m. Monday, November 24th—a prison guard discovered that appellant had slashed his left arm in sev-

---

[8] In this respect "Eddie" Scoleri's testimony was in direct conflict with appellant's testimony that he was standing near the Iocco apartment when "Eddie" Scoleri drove up with Woods in the car.

[9] "Yogi" Santarpio died as the result of a stabbing by one Daly in October, 1958. It is significant that the two persons claimed by "Eddie" Scoleri to have been the participants in the robbery were "Yogi" and Woods, whose lips had been sealed by death at the time of trial.

[10] The trial began November 17th and concluded November 26th, 1958.

eral places;[11] 24 sutures were required to close the lacerations and, at approximately 7 a.m., appellant was given 600,000 units of penicillin and 100 milligrams of thorazine, a tranquilizer. The court was apprised of this situation and withheld resumption of the trial until 7:30 p.m. on that date. Throughout the morning and afternoon of November 24th the court received numerous medical reports concerning appellant's physical and mental condition.[12] Dr. Carideo, a police surgeon, examined appellant at 11 a.m. and reported that he was then under the influence of sedation but, in the doctor's opinion, was malingering to some extent. After another examination of appellant at 2 p.m., Dr. Carideo again reported to the court and the following discussion took place:

"DR. CARIDEO: He is still under the effect of sedation and medication that he had this morning. There is evidence of the sedative effects. He does respond to stimuli, but he lapses back into drowsiness, *and he is uncooperative, and that is the large element of his present condition.*

"THE COURT: Doctor, I noticed you were talking to him and he made no response, and then you asked him to take a deep breath What was it you put up to him?

"DR. CARIDEO: Aromatic spirits.

"THE COURT: Which he fought, and he threw his head violently to the right and left, and when his head was held and he was restrained, you forced him to smell it, and he did take a deep breath, and then a moment thereafter you asked him how he felt and he answered, 'All right.'

---

[11] Apparently, a broken mirror was employed for this purpose.

[12] All medical reports received by the court during November 24th were received outside the presence of both appellant and the jurors but in the presence of defense counsel who were thoroughly conversant with the entire situation.

"Dr. Carideo: You may have noted when I held the perle of aromatic spirits to his nose, he didn't breathe. His breathing stopped at that point—*He would not inhale. So there is a conscious element there that is coupled with his restraint and his unwillingness to cooperate.*"

. . .

"The Court: . . . Doctor, do you anticipate within hours, when this so-called tranquilizer, the effect thereof, has worn off, that he will be capable?

"Dr. Carideo: I see no other reason for him not responding other than malingering after a reasonable period of time has elapsed so that this is out of his system." (Emphasis supplied)

At 7:30 p.m., after another examination of appellant, Dr. Carideo reported, that, in his opinion, none of the physical effects earlier noted then existed, the effects of the drug thorazine should have been fully dissipated and appellant was then aware of his surroundings. *At this point the trial was resumed without any objection on the part of defense counsel.*

At approximately 9:15 p.m. the trial court ordered a trial recess. Again Dr. Carideo examined appellant and the following discussion took place:

"The Court: Doctor, you have just examined him during the recess period. Is your opinion the same now as it was when we started, or is he in a better condition to hear than he was?

"Dr. Carideo: I think his condition is better. I think he is more responsive to stimuli and beginning to speak spontaneously, and he asked for a glass of water, and desired to use the toilet, and I think he is more responsive now than he was in the beginning. *His condition is essentially normal otherwise;* his pressure, respiration and pulse are all normal.

"The Court: Of course, that was his condition before we brought him in the first time?

"DR. CARIDEO: Yes, that is correct.

"THE COURT: So that you think, as you did then, he is not only capable of understanding, but more capable of understanding?

"DR. CARIDEO: More so than he was possibly five hours ago." (Emphasis supplied).

After another examination by Dr. Carideo at 9:40 p.m. the trial was then resumed, *again without objection by defense counsel.* At 10:20 p.m., after the defense had completed its testimony and before the Commonwealth presented its rebuttal evidence, the following discussion took place:

"MR. McCLAIN: If the Court please, I object to any rebuttal being produced by the Commonwealth in the present condition of this defendant. Neither my colleague, Mr. King, nor myself are able to consult with him or talk to him about the evidence which is now to be offered. Therefore, I object to any further testimony on behalf of the Commonwealth until he is able to consult with his counsel.

"THE COURT: I have been advised before we brought him in that he was able to consult. I have been advised by the doctors. A doctor is here in attendance, and he has stated that since that time he is better able than he was five hours ago, which antedated the time we started this session by two hours, and you notice this, he has asked for water, and he has asked for a blanket, and inasmuch as some of the testimony has been taken within his presence and within his hearing, I do not propose to have this case interrupted any longer.

Your objection is overruled."

"MR. McCLAIN: Will your Honor bear with me a moment? I say to you, your Honor, that examination comes from a police surgeon, and we should like the privilege of having a physician of our own selection make an examination of this man.

"THE COURT: Colonel, I asked you that before we started this session, and you told me you had a doctor with you, and I told the police surgeon, Dr. Carideo, not to go in there without the other doctor.

"MR. McCLAIN: That was, your Honor—

"THE COURT: Pardon me, I have not finished. I asked you and Mr. King, and I held the doctor back there, and you told me you did not wish or desire to have this man examined by another physician, and it was then, and then only, I permitted Dr. Carideo to go back there to make another examination.

"MR. McCLAIN: Perhaps there was a misapprehension, your Honor. That doctor who was in the elevator with us coming up was Dr. Rotman from the Southern Division of the Einstein Center.

"THE COURT: So I found out afterwards.

"MR. McCLAIN: Whom we were calling to testify to that slip that your Honor has not allowed in evidence.

"THE COURT: I understand that now, but I asked you when I learned that whether you were going to bring a doctor in to examine him, and both you and Mr. King said, no.

"MR. McCLAIN: We have had no opportunity to consult the doctor.

"THE COURT: You had opportunity all day. I gave you that opportunity all day long to do that, and you haven't done it, and now at this time, twenty minutes past ten at night, after this jury has been held up all day with nothing to do, you come in and ask for that.

Objection overruled. You have an exception and the record is protected."

The next morning both Dr. Carideo and a Dr. Ingaglio—the latter selected by defense counsel—examined appellant and reported to the trial judge. Dr. Ingaglio stated: "I haven't found anything at all contrary to Dr. Carideo's examination. The patient is

evidencing no signs of blood loss, but *he is evidencing signs of acute anxiety neurosis, which is probably secondary to the fact that he is being put on trial,* and I do not think it differs substantially at all from what Dr. Carideo stated." (Emphasis supplied). Dr. Ingaglio added that defendant was "going to be like a log" and that he "would benefit very much if he had a little bit of psychiatric care" at that time. Dr. Carideo, in answer to an inquiry by the court, responded that he thought "[appellant's] mood or disposition is something he is going to maintain as long as he is under the same set of circumstances."

Appellant's counsel[13] now contends that the trial court, in this connection, erred: (1) in directing that the trial resume after having been informed by defense counsel that they were unable to consult or talk with him about the evidence about to be offered by the Commonwealth; (2) in receiving evidence concerning appellant's physical and mental condition in the absence of both appellant and the jury and later instructing the jury concerning such evidence; (3) in permitting the trial to resume after receiving medical advice as to defendant's disability.

Certain facts in the background of this incident should be noted: (1) both "Tony" Scoleri and "Eddie" Scoleri had fully completed their testimony prior to the week-end adjournment of the trial on November 22nd; (2) when appellant was first examined after discovery of his injury, it was ascertained that the lacerations were minor —only skin deep without any tendon or arterial involvement,—the loss of blood was slight, his blood pressure and pulse were good and, even though in a conscious state, appellant refused to cooperate with the medical examiner.

Appellant's apathy, lethargy or drowsiness, if any existed, could be attributed to only one cause, i.e., the

---

[13] Appellant's counsel on appeal was not the trial counsel.

reception into his body of the tranquilizer thorazine, yet such drug was administered twelve hours prior to resumption of the trial. The record is clear that, from the time when first advised of appellant's injury until the trial was resumed and thereafter, the trial judge was most solicitous and zealous in ascertaining the *true* status of appellant's physical and mental condition and to that end engaged and employed the services of the admittedly qualified Dr. Carideo. In addition thereto, the trial judge made his own personal observations of appellant and his actions and suggested to defense counsel that they have a medical examination by a doctor of their own choice, a suggestion defense counsel did not accept. When trial was resumed appellant was continuously in the courtroom and the *record does not reveal any evidence that appellant at any time lost consciousness but, on the contrary, illustrated an awareness of his surroundings.* The best available medical advice was that appellant's mental and physical condition justified resumption of the trial; examination of the record leads to the conclusion that appellant was simply malingering. Not only does the record clearly negate appellant's contention that the trial court did not exercise any discretion under the circumstances but it shows conclusively that the trial was resumed only after, by personal observation and upon competent medical advice, the trial judge was satisfied as to appellant's fitness to stand trial. Resumption of a trial is within the trial court's discretion; our independent review of the instant record satisfies us that the trial judge did not abuse his discretion in this respect.

Appellant next urges that appellant had the right to confront all the witnesses and be present at every stage of the trial; with that statement of the law there can be no disagreement: *Commonwealth v. Ballem*, 386 Pa. 20, 29, 123 A. 2d 728; *Commonwealth ex rel. Tanner v. Claudy*, 378 Pa. 429, 431, 106 A. 2d 401; *Commonwealth*

*v. Johnson,* 348 Pa. 349, 352, 35 A. 2d 312; *Commonwealth v. Corsino,* 261 Pa. 593, 598, 104 A. 739. The issue in this capital case was "Tony" Scoleri's guilt or innocence of the crime of murder charged in the indictment; *at every stage of the trial of this issue* "Tony" Scoleri had the right to be present and the record clearly shows that this right was carefully preserved. The argument is now made that the resolution of the issue of Scoleri's mental and physical condition as affecting his ability to stand trial requires the application of the same rule and that not only Scoleri but the jury had to be present when the trial judge received Dr. Carideo's reports. Such a contention is without merit. *Com. v. Iacobino,* 319 Pa. 65, 69, 73, 178 A. 823, is apposite. In *Iacobino,* after conclusion of the Commonwealth's evidence, defense counsel moved for the appointment of a commission to inquire into defendant's sanity at the time of trial and the court appointed a commission. After conviction, Iacobino contended that, since he had no opportunity to confront and cross-examine the witnesses who appeared before the commission and no opportunity to examine the commission in open court, he was deprived of his constitutional right. This Court, in affirming Iacobino's conviction, declared that the commission's inquiry was "for the determination of a fact apart, separate and distinct from that of guilt of the crime itself, . . . 'and' . . . is directed to the conscience of the court, and the court . . . has a wide latitude in order to inform itself fully as to the prisoner's condition." See also: *Commonwealth v. Bechtel,* 384 Pa. 184, 190, 191, 120 A. 2d 295; *Commonwealth v. Moon,* 386 Pa. 205, 213, 125 A. 2d 594. Actually the trial court by receiving Dr. Carideo's report outside the jurors' presence avoided the possibility of likely prejudice to Scoleri; had the jury learned that Scoleri had endeavored to take his own life or Dr. Carideo's opinion that he was malingering,

Scoleri would in all likelihood have been seriously prejudiced in the jurors' minds.

When the trial resumed the court stated to the jury: "Before we start, I want you to know that under professional medical advice this defendant's trial continued, notwithstanding what you have witnessed here in the courtroom. The professional medical advice was that he was competent to hear everything intelligently, his pulse was normal, there was no high blood pressure, no distress, and there was no medical reason for this particular condition, an obvious condition, and the physicians say there was nothing wrong with him whatsoever. Had it been that he was incapable of hearing what was going on here, we could not have proceeded. We would have just had to continue the case. We continued it for one day, as you know."

For obvious reasons this statement evoked neither objection nor unfavorable comment from defense counsel. The trial court's statement was fair to both Commonwealth and Scoleri; it allayed any possible suspicion of an attempt by Scoleri at self-destruction as well as any sympathy which Scoleri's obvious condition might have engendered in the jury.

Dr. Ingaglio, after he examined appellant on November 25th, was of the opinion that psychiatric care would be helpful at that time. Defense counsel made no objection to resumption of the trial on that basis but it is now urged that, in the face of this suggestion, it was error for the trial to be resumed. That "Tony" Scoleri at trial for murder, suffered from anxiety and apprehension was an essentially normal, not abnormal nor unusual, manifestation. Freedom from worry and anxiety is yet to be recognized as a right guaranteed, by the constitution or otherwise, to a defendant on trial for a crime, particularly the crime of murder. With eminent propriety the trial court under the circumstances herein presented resumed the trial.

Challenge is made to several portions of the trial court's charge on reasonable doubt. The thrust of this challenge is: "In the present case, the trial judge instructed the jury correctly in several portions of his charge on the principle of reasonable doubt. However, he twice instructed them erroneously to the effect that every fact upon which any verdict could be based had to be established beyond a reasonable doubt. Neither time did the trial judge add the qualification that he was talking only about guilty verdicts when he said the standard of reasonable doubt applied."[14] Similar arguments have been made and rejected by this Court: reversible error cannot and should not be predicated upon "isolated excerpts" taken out of context of the court's charge if the charge as a whole and in its totality has adequately and properly covered the subject: *Commonwealth v. Schurtz*, 337 Pa. 405, 411, 10 A. 2d 378; *Commonwealth v. Barnak*, 357 Pa. 391, 406, 54 A. 2d 865; *Commonwealth v. Holley*, 358 Pa. 296, 302, 56 A. 2d 546; *Commonwealth v. Kloiber*, 378 Pa. 412, 418, 106 A. 2d 820; *Commonwealth v. Thompson*, 389 Pa. 382, 395, 133 A. 2d 207. Even if it be assumed, arguendo, that the challenged portions of the instant charge,

---

[14] The allegedly erroneous portions of the instructions were: "First of all when I speak to you about reasonable doubt, and I did, that reasonable doubt applies to every fact in the case. For instance, you must find beyond a reasonable doubt that the man was murdered, that there was such a man as Max Gordon, and it happened on that day or near that time. There is no statute of limitations on Murder, but you have to find all those facts; every fact upon which the ultimate verdict must rest must be established in your minds by credible evidence, evidence which you believe beyond a reasonable doubt". . . . "I am not going to begin to itemize all the facts, because it would take another day or two, but you must find every fact upon which a verdict is predicated to be in existence beyond a reasonable doubt, and when you find them all to exist beyond a reasonable doubt, then the same rule of reasonable doubt applies to your final fact-finding, and that is your verdict".

standing alone, were erroneous, yet a scrutiny of the charge in its entirety on the subject of reasonable doubt makes evident its adequacy and propriety. "Appellant has assigned for error certain excerpts from the charge of the court. The charge in its entirety affords no grounds for the reversal of the judgment and sentence. Certain excerpts if they stood alone might have misled the jury to the defendant's prejudice. . . . Defendant's rights were fully protected by the charge in its totality": *Commonwealth v. Malone*, 354 Pa. 180, 184, 47 A. 2d 445. We have examined with care the entire charge of the court on reasonable doubt: such examination, clearly and unmistakably, indicates that that which the trial court stated to the jury on reasonable doubt and its applicability to the instant case could not in any manner have either misled or confused the jury. In this respect, we are mindful of the judicial admonition in *Commonwealth v. Barnak*, supra (p. 419): "Taking an appeal in criminal cases is not a game in which the appellant wins if he can show that the trial judge fell a few degrees short of perfection in the conduct of his trial . . . ."

On the defense of alibi the trial court stated: "What is an alibi? First of all, when an alibi is set up, it still requires the Commonwealth to prove every essential element of the case. The Commonwealth cannot be remiss, it still has to prove every element of the case, notwithstanding the fact that an alibi is set up. The Commonwealth's statements of fact must include the presence of the defendant at the time of the homicide, because that is the material factor or material element in the case . . .". Further: "A defendant is not required to establish an alibi beyond a reasonable doubt. It is a strong defense, it is a full defense, it is a perfect defense—in fact, the most perfect defense a man can make, because, as I said to you, no man can be in two distinct places at the same time, and even if he at-

tempts to set up an alibi, the burden on the Common-wealth does not change.. The Commonwealth must con-tinue to prove its case, because his plea of not guilty is still there. It is a general traverse to all the charges, including, of course, his participation." Further: "You do not have to believe evidence of alibi beyond a rea-sonable doubt. *The burden to prove it, however, is on the defendant.* He must prove it, not beyond a reason-able doubt, but to your satisfaction, and if he does not do that, the whole thing collapses and he has no alibi. He must prove it to your satisfaction . . . ." (Emphasis supplied)

When given, these instructions were in full accord with the then existing principles of the law: *Rudy v. Commonwealth,* 128 Pa. 500, 507, 508, 18 A. 344; *Com-monwealth v. Barrish,* 297 Pa. 160, 167, 168, 169, 170, 146 A. 553; *Commonwealth v. Jordan,* 328 Pa. 439, 446, 196 A. 10; *Commonwealth v. Blanchard,* 345 Pa. 289, 291, 26 A. 2d 303; *Commonwealth v. Richardson,* 392 Pa. 528, 544, 140 A. 2d 828; *Commonwealth v. Gates,* 392 Pa. 557, 564, 141 A. 2d 219; Sadler, Criminal Pro-cedure in Pennsylvania, (2nd ed.), Vol. 2, 580. Cf: *Commonwealth v. Barnak,* 357 Pa. 391, pp. 406, 407, footnote, 54 A. 2d 865. On May 28, 1959—six months subsequent to the appellant's trial and conviction— *Commonwealth v. Bonomo,* 396 Pa. 222, 151 A. 2d 441, effected a change in the law on this subject. In *Bonomo* (p. 230), this Court stated: "Hence, whenever the prosecution relies upon proof that the defendant is present at the commission of the crime, it cannot be said with any show of reason that the defendant, who asserts he was absent, has any burden of proving it." Appellant seeks a new trial because of the change in the law effected by *Bonomo.* As Mr. Justice McBRIDE clearly and distinctly set forth in *Bonomo,* the Court established "the rule which shall be followed *hereafter* in this jurisdiction":[15] *Bonomo* furnishes the guide for

---

[15] Emphasis supplied.

*future* judicial instructions on the subject of alibi; by its unambiguous language, it is prospective, not retrospective, in operation and jury instructions given prior to the rendition by this Court of *Bonomo* remain unaffected thereby. The instructions given on the subject of alibi by Judge CARROLL were entirely proper when given and furnish no ground for the grant of a new trial.[16]

Lastly, appellant contends that the passage—one year subsequent to appellant's trial and conviction—by the 1959 legislature of the so-called "split verdict" statute[17] compels the grant of a new trial. Although

[16] "This is a case where a court has refused to make its ruling retroactive, and the novel stand is taken that the constitution of the United States is infringed by the refusal. We think the Federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions": Mr. Justice CARDOZO, speaking for the Court, in *Great Northern Railway Company v. Sunburst Oil & Refining Company*, 287 U. S. 358, 364, 77 L. ed. 360, 366. See also: Von Moschzisker, "Stare Decisis in Courts of Last Resort," 37 H. L. Rev. 409 et seq.

[17] Act 594 of 1959, approved December 1, 1959. In substance this statute provides that in the trial of a murder indictment the jury shall be informed by the court that if they find the defendant guilty of murder in the first degree it will be their duty to fix the penalty *after* hearing additional evidence, if any, on the question of the penalty. If the jury agrees on a verdict of murder in the first degree and such verdict is recorded, "before the jury is permitted to separate the court shall proceed to receive such additional evidence not previously received in the trial as may be relevant and admissible upon the question of the penalty to be imposed upon the defendant and shall permit such argument by counsel and deliver such charge thereon as may be just and proper in the circumstances." The jury then retires and considers the penalty to be imposed: a failure of the jury to agree on the penalty does not invalidate the verdict of murder in the first degree; in the event the jury cannot agree the court in its discretion may discharge the jury and sentence the defendant to life imprisonment.

unexpressed in the statutory provisions, the real impact of the 1959 statute is upon a court-established rule of evidence, a rule which sanctioned the admissibility into evidence in a capital case of the defendant's record of prior convictions. For over three decades—beginning with *Commonwealth v. Parker*, 294 Pa. 144, 143 A. 904—this Court has approved the introduction into evidence by the Commonwealth in a capital case of the record of the defendant's prior convictions for the sole purpose of aiding the jury in fixing the penalty in the event the jury finds the defendant guilty of murder in the first degree, but not for the purpose of determining defendant's guilt or innocence: *Commonwealth v. Thompson*, supra. The *Parker* rule has been the subject of severe criticism—even by members of the present Court[18]—and the new statute was passed to meet such criticism. The effect of the statute is to remove the rationale of the *Parker* rule and, thus to abolish it: henceforth, the Commonwealth *cannot* introduce into evidence in a capital case a defendant's record of prior convictions until *after* the jury has determined the defendant guilty of murder in the first degree and such verdict has been recorded. Granted the salutary effect of this new legislation, does it necessarily follow that its provisions should be made applicable to capital cases where, prior to the passage of the legislation, a defendant has been tried, found guilty of murder in the first degree and judgment of sentence entered but, at the time of the passage of the statute, an appeal from such judgment of sentence is pending? The soundness of the legislation alone does not impel

---

[18] *Commonwealth v. DePofi*, 362 Pa. 229, 251, 66 A. 2d 649 (dissenting opinion by the present Chief Justice); *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733 (majority opinion, BELL, J.); *Commonwealth v. Thompson*, supra, 417 et seq. (dissenting opinion, MUSMANNO, J.).

132

a construction of this statute as retroactive or retrospective in its operation.[19]

For the ascertainment of the legislative intent in determining whether a statute.is retroactive or retrospective in operation the legislature itself has set up certain definite yardsticks for the guidance of the judiciary.

In the first place, Section 56, Art. IV of the Statutory Construction Act[20] provides: "No law shall be construed to be retroactive unless *clearly and manifestly* so intended by the legislature." (Emphasis supplied). In the construction of statutes our courts have uniformly adhered to this legislative mandate: *Commonwealth v. Rockwell Mfg. Co.,* 392 Pa. 339, 140 A. 2d 854; *Creighan v. Pittsburgh,* 389 Pa. 569, 132 A. 2d 867; *Hirsch v. Bunker Hill Mutual Ins. Co.,* 389 Pa. 92, 132 A. 2d 212; *Sawdey Liquor License Case,* 369 Pa. 19, 85 A. 2d 28; *Bowie Coal Company Petition,* 368 Pa. 102, 82 A. 2d 24; *Commonwealth v. Repplier Coal Co.,* 348 Pa. 372, 35 A. 2d 319; *Farmers Nat'l Bank & Trust Co. v. Berks County Real Estate Co. et al.,* 333 Pa. 390, 5 A. 2d 94. See also: *Barnet v. Barnet,* 15 S. & R. 71, 72; *Mullock v. Souder,* 5 W. & S. 198, 199; *Neff's Appeal,* 21 Pa. 243, 247; *Taylor v. Mitchell,* 57 Pa. 209, 211, 212. The instant statute not only lacks a clear and manifest expression of intent that it be construed retroactively, but it does not contain any such implication. In the second place, since the 1959 statute is amendatory, Section 73, art. V of the Statutory Construction Act applies: "Whenever a section or part of a law is amended, the amendment shall be construed as merging into the original law, become a part there-

---

[19] Appellant's counsel studiously avoids the word "retroactive", an avoidance no doubt wisely dictated by reason of the clarity of the legislative mandate concerning the construction of statutes as retroactive.

[20] Act of May 28, 1937, P. L. 1019, 46 PS §556.

of, and replace the part amended and the remainder of the original law and the amendment shall be read together and viewed as one law passed at one time; but the portions of the law which were not altered by the amendment shall be construed as effective from the time of their original enactment, *and the new provisions shall be construed as effective only from the date when the amendment became effective.*" (Emphasis supplied) Hence amendatory statutes are construed retroactively *only* if such construction is clearly indicated under the provisions of the statute: *Rupert v. Policemen's Relief and Pension Fund,* 387 Pa. 627, 129 A. 2d 487; *Commonwealth v. Repplier,* supra; *Cavanaugh et al. v. Gelder,* 364 Pa. 361, 72 A. 2d 85, cert. den, 340 U. S. 822, 71 S.C. 55. Under the above cited provisions of the Statutory Construction Act, a construction that this new legislation was intended to be retroactive in operation cannot properly be judicially declared.

*Commonwealth ex rel. Lyons v. Day,* 177 Pa. Superior Ct. 392, 110 A. 2d 871, *Commonwealth v. Voci,* 393 Pa. 404, 143 A. 2d 652 and *Commonwealth v. Bishop,* 285 Pa. 49, 131 A. 657, are illustrative of a sound judicial refusal to apply criminal statutes retroactively. In *Day,* supra, the relator in a habeas corpus proceeding, convicted of burglary in 1946, had been sentenced to the Pennsylvania Industrial School under a statute which required him to serve a 20 year maximum term unless sooner released by the Pardon Board; in 1953 the legislature passed an amendatory statute limiting the duration of a sentence to the Industrial School to a 6 year term; the Superior Court rejected relator's contention that the 1953 statute operated retroactively to reduce his duly imposed sentence. In *Voci,* supra, we did not apply retroactively a statute prohibiting the introduction of evidence secured by wiretap in any Pennsylvania court to proceedings then pending on appeal in which Voci had been convicted on the basis of

evidence obtained by wiretapping. The fact that the question was not directly raised in *Voci* did not affect the result. In *Bishop,* supra, Bishop was tried and convicted of murder in the first degree and the penalty fixed at death; subsequently and during the pendency of an appeal to this Court, the legislature passed a statute which permitted a jury, after a conviction of murder in the first degree, to fix the penalty either at life or death, whereas when defendant was tried and convicted a verdict of murder in the first degree automatically carried with it the imposition of the death penalty. Even though the jury had requested leniency—in a note addressed to the court—this Court stated: "As this was prior to the Act of May 14, 1925, neither the court nor jury had any discretion in fixing the penalty for first degree murder." (p. 59)

One hundred ten years ago in *De Chastellux v. Fairchild,* 15 Pa. 18, 20, Chief Justice GIBSON stated: "If any thing is self-evident in the structure of our government, it is, that the legislature has no power to order a new trial, or to direct the court to order it, either before or after judgment. The power to order new trials is judicial; but the power of the legislature is not judicial." Mr. Justice (later Chief Justice) WOODWARD in *Commonwealth ex rel. Johnson v. Halloway,* 42 Pa. 446, 448, 82 Am. Dec. 526, stated: "The whole judicial power of the Commonwealth is vested in courts. Not a fragment of it belongs to the legislature. The trial, conviction and sentencing of criminals are judicial duties, and the duration or period of the sentence is an essential part of a judicial judgment in a criminal record. . . . If [the legislature] may authorize boards of inspectors to disregard judicial sentences, why may they not repeal them as fast as they are pronounced, and thus assume the highest judicial functions? It is to be observed that these questions have no reference to the power of the legislature to prescribe a general rule of law that

shall be inconsistent with a previous judicial decree. *Such a rule, when it operates on future cases and not retrospectively, is quite legitimate.* Their power to legislate in that manner is not to be doubted. . . . Any interference with [a judicial sentence], except by a court of superior jurisdiction, or by the executive power of pardon, would seem to be a prostration of that distribution of governmental functions which the constitution makes among three co-ordinate departments. In this view the act would be highly unconstitutional." To like effect: *Pennsylvania Company etc. v. Scott,* 346 Pa. 13, 16, 17, 29 A. 2d 328; *Leahey v. Farrell et al. (Commonwealth, appellant),* 362 Pa. 52, 55, 56, 66 A. 2d 577. (Emphasis supplied).

The appellant's contention rests not upon a legal, but upon an emotional, basis for an application of this statute in a retroactive manner. What appellant in effect says is that the method of procedure formerly recognized by this Court—the one under which appellant was tried and convicted—was an "unfair" method and that the opportunity has now arisen by virtue of the new procedure set forth in the statute for the Court, by the grant of a new trial, to direct that the appellant be tried under a form of procedure more "fair" in that the jury will not know, before reaching a verdict on the issue of guilt or innocence, of appellant's past criminal record. Such argument would be applicable not only to the appellant but also to all other defendants under conviction of murder in the first degree whose cases are awaiting disposition either in the lower courts or in this Court as well as the hundreds of convicts now in prison or penitentiary for life for first degree murder whose cases have been concluded by the entry of a final judgment.[21]

---

[21] As to the latter category counsel for the appellant takes the position that if such persons presented writs of habeas corpus based upon the reason herein advanced their lot would be "hopeless". In

This defendant has no right, vested or otherwise, to a new trial by a particular procedural process provided that the procedure under which his trial was conducted met the requirement of the due process clause: *Agostin v. Pittsburgh Steel Foundry Corp.*, 354 Pa. 543, 47 A. 2d 680; *Penelope Club Liquor License Case,* 136 Pa. Superior Ct. 505, 512 et seq., 7 A. 2d 558, 562; *Fleming v. Rhodes*, 331 U. S. 100, 91 L. ed. 1368; *Snyder v. Mass.*, 291 U. S. 97, 78 L. ed. 674; *Luria v. United States*, 231 U. S. 9, 58 L. ed. 101; *Thompson v. Utah*, 170 U. S. 343, 42 L. ed. 1061; *Hopt v. Utah*, 110 U. S. 574, 28 L. ed. 262; *Gibson v. Mississippi*, 162 U. S. 565, 40 L. ed. 1075; *U. S. v. Papworth*, 156 F. Supp. 842, 851, aff'd. 256 F. 2d 125.

We have carefully examined the entire record of these proceedings and are satisfied that appellant was given a fair trial. He was accorded the benefit of every right guaranteed by law to a defendant in a capital case; he was tried in a manner and under a form of procedure sanctioned by this Court on innumerable occasions; he had able counsel who were given full opportunity to present in all its details appellant's defense; his trial was free from error on the part of the court.

---

an analogous situation it has been stated: "Some of the reasons and explanations given for the rule under which pending prosecutions are abated by a repeal [of the statute under which such persons were tried and convicted] would seem to apply equally as well to the discharge of persons who have been convicted and sentenced prior to the repeal. If, as is sometimes said, the repeal operates as a legislative pardon, why should it not operate as a pardon just as much in the case of prosecutions in which a final judgment has been entered as in the case where no such judgment has been entered? Can it be said that the legislature intended to pardon one class of offenders and not the other class? Occasionally the courts invoke the rule that a repealed statute is to be treated as if it had never existed. But if the statute is to be regarded as never having existed, surely it is wrong to keep incarcerated persons convicted under its provisions. . . ." 89 A.L.R. 1518.

His conviction was fully justified by the evidence; no other verdict would have been consistent under the circumstances of this case. That the 1959 statute provides for a fairer trial procedure for the future furnishes no legal reason for the grant of a new trial.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The jury in this case found the defendant guilty of murder in the first degree and fixed the penalty at death. The defendant has appealed, alleging trial errors.

During the trial, the question arose as to whether the defendant was physically and mentally able to understand what was transpiring in the courtroom at the time. Instead of resolving this question with the scientific impartiality of a thermometer lowered into water to ascertain its temperature, the judge became impatient and ruled in a manner which suggested that his decision was being guided by anger rather than by cool intellectual processes.

The facts are as follows. In the early morning of November 24, 1958, being the seventh day of the trial, the defendant Anthony Scoleri was discovered by a prison guard to be suffering from many lacerations to his arm, apparently self-inflicted. Surgical attention was required and 24 stitches closed the wounds. In order to prevent infection he was given 600,000 units of penicillin and so as to induce sedation there were administered to him 100 milligrams of thorazine.

The trial judge, learning of what had happened, ordered the day's session to begin at 2 p.m., but at that hour the police surgeon, Dr. Carideo, reported that the defendant was still suffering from the effects of the medication to which he had been subjected and that intermittently he lapsed into drowsiness. The judge, who

had watched the doctor as he examined the defendant, made his own medical observations:

"THE COURT: Doctor, I noticed you were talking to him and he made no response, and then you asked him to take a deep breath. What was it you put up to him?

DR. CARIDEO: Aromatic spirits.

THE COURT: Which he fought, and he threw his head violently to the right and left, and when his head was held and he.was restrained, you forced him to smell it, and he did take a deep breath, and then a moment thereafter you asked him how he felt and he answered, 'All right.' "

The judge postponed proceedings until 7:30 that evening. At that hour the trial was resumed. Four attendants carried Scoleri into the courtroom on a collapsible stretcher which was placed on the floor. With the defendant prostrate on the floor the trial proceeded until 9:15 when the police surgeon examined him and reported to the court that his condition was "better" and that "he is more responsive to stimuli and beginning to speak spontaneously." Also, that "his condition is essentially normal otherwise; his pressure, respiration and pulse are all normal.".

The fact that the doctor used comparatives, namely, that the defendant was "more" responsive to stimuli, plainly denotes that he had not been completely responsive to stimuli prior to that time. The fact that the doctor said that the defendant was *beginning to speak spontaneously*" clearly implies that from 7:30 until 9:15 he could not speak spontaneously and therefore could not communicate with his attorney while evidence was being presented in his case. The fact that the doctor used the word "otherwise" indicates that Scoleri could have been lacking complete awareness. The doctor emphasized this concept when, in answer to the judge's question as to whether the defendant was

capable of understanding, the doctor replied: "More so than he was possibly five hours ago."

"More so" speaks for itself.

Thus, there can be no doubt that some time during the previous five hours, one hour and forty-five minutes of which transpired in the active courtroom, the defendant lacked complete understanding of what was transpiring and was therefore unable to confront the exigencies and demands of the trial.

At 2 p.m., the judge had himself admitted that the defendant was incapable of understanding everything. The record shows the following colloquy between the judge and Dr. Carideo at the time:

"THE COURT: In view of that, the Doctor thinks he is still under enough of this sedation or tranquilizer—

DR. CARIDEO: Tranquilizer, that is correct, sir.

THE COURT: —to make him capable of understanding what goes on, but perhaps not understand everything. Is that correct, Doctor?

DR. CARIDEO: That is correct, sir."

However, all this is merely prelude to the serious happenings which occurred later. At 10:20 p.m., Mr. McClain, one of defense counsel, made the categorical statement that the defendant's condition was such that it was impossible for counsel and co-counsel to talk to him. These are Mr. McClain's words: "If the Court please, I object to any rebuttal being produced by the Commonwealth in the present condition of this defendant. Neither my colleague, Mr. King, nor myself are able to consult with him or talk to him about the evidence which is now to be offered. Therefore, I object to any further testimony on behalf of the Commonwealth until he is able to consult with his counsel."

The judge, however, instead of having the doctor (who was present and prepared to give service) resolve

the problem by examining the defendant, chose to enter into a wordy one-sided debate about the matter. The judge said: "I have been advised before we brought him in that he was able to consult. I have been advised by the doctors. A doctor is here in attendance, and he has stated that since that time he is better able than he was five hours ago, which antedated the time we started this session by two hours, and you notice this, he asked for water, and he asked for a blanket, and inasmuch as some of the testimony has been taken within his presence and within his hearing, I do not propose to have this case interrupted any longer. Your objection is overruled."

The fact that the doctor told the judge that the defendant was "better able than he was five hours ago" certainly cannot be accepted as evidence as to what his *present* condition was. A fever patient who has a temperature of 104½ degrees at 5 o'clock and a temperature of 104 at 10 o'clock is certainly better off than he was before, but not very much.

After his objection had been overruled, defendant's counsel asked to be heard on the matter. He pointed out that the advice referred to by the judge came from a police surgeon and that he wished to have the privilege of calling in a physician of his own selection to examine the defendant. Instead of passing upon this reasonable request, the judge took counsel to task. He said that he had given defense counsel an opportunity to get a doctor. The defense counsel replied: "We have had no opportunity to consult the doctor."

The judge then censured defense counsel: "You had opportunity all day. I gave you that opportunity all day long to do that, and you haven't done it, and now at this time, twenty minutes past ten at night, after this jury has been held up all day with nothing to do, you come in and ask for that. Objection overruled."

This lecture by the judge turned a serious murder trial into a checker game. Whether defense counsel did or did not find an opportunity to obtain a doctor during the day was entirely irrelevant to the issue the judge should have decided, namely: Was the defendant in condition to go on with the trial at that time? Defense counsel could have been a hundred per cent improvident in attending to his duties, but such improvidence should not become a yoke to fasten on the defendant. You may not hang an accused because of the fault of the attorney, assuming that there was fault, which certainly does not appear in this case.

The judge here was unreasonable in more ways than one. The crisis occurred at night, not during the day. Examining the defendant in the daytime would not determine whether he was to be unconscious at 10:20 p.m. You can't set the bone of a man's leg before it is broken. Many doctors could have found Scoleri well throughout the entire day, and he could still have collapsed at 10:20 p.m.

I repeat that the only issue before the judge was whether Anthony Scoleri was mentally aware of what was taking place, whether he was able to consult with his attorney, and whether he was mentally able to grasp the evidence moving him toward his death. This issue the judge refused to meet and, in that refusal, he denied the defendant due process.

As far as the history of the case shows, the defendant at this point could have been entirely unconscious. He lay on the floor like a stray dog that had slipped by the guard at the door and was either dazed by what was happening around him or did not move for fear he might be kicked out. Regardless of what the defendant's antecedents may have done, he was still a human being on trial for his life and he was entitled to the solicitude of the judge, who was charged with the responsibility of seeing to it that the accused's consti-

tutional rights were protected. It cannot be pretended that a defendant who is bereft of his senses while evidence is being presented is receiving a fair trial.

The judge may have been annoyed because Scoleri's wounds had possibly been self-inflicted, but, regardless of the defendant's actions in that respect or in any respect, the judge should not have allowed his temper to gain an upper hand over the equanimity which is always expected of a judge. A judge, of course, is a human being like everyone else, but when he mounts the bench he must leave behind the frailties and passions which are sheddable. Anger is one of them. A judge may react like any other human being and he would not be a good judge if he did not, but he must control the outer expression of his inner feelings so that his pronouncements will express cold neutrality and not his past experiences as a "fighting district attorney" or as a "battling criminal lawyer."

No judge should ever be visibly wrought up in the presence of the jury. He should never hurl thunderbolts of Olympian judgment when there is always the danger that one of them may strike the constitutional rights of the accused. When a judge becomes wrathful on the bench, the fury of his ire may sweep into the jury box and, in consequence, the jury may generate against the target of his rage a resentment which is not kindled from the evidence.

The Majority Opinion argues valiantly to support the position taken by the trial judge in this case, but it is to be noted that it does not controvert, because it cannot, the following grave and momentous fact. Defense counsel, who, of course, is an officer of the court, made the categorical and definitive statement that the defendant was in such condition that he could not consult with his lawyer to discuss the Commonwealth's evidence aimed at sending him to the electric chair. Neither the Commonwealth nor the judge disproved

defense counsel's statement in this regard. Thus, considering defense counsel's unimpeachable standing at the bar, his statement must be accepted as true. And this brings us to the horrifying conclusion that the Commonwealth produced evidence against one standing trial on a capital charge during the time that he could not hear, could not understand, and was entirely unaware of what was being said. If this is not a good reason for a new trial, then no judicial usurpation or lapse is ground for a new trial.

Nor can it be said that the error was a harmless one. The evidence presented by the Commonwealth against the defendant when, according to the undenied statement of defense counsel, the defendant was incapable of comprehending what was taking place, was of an extremely vital character. The defendant, whose defense was that of an alibi, had testified that he could not have been the person seen running from the locale of the crime because an injury had compelled him to walk with a limp.

Whether he walked normally or limped, on or about the day of the crime, became, therefore, a matter of supreme importance in determining identity of the actual criminal. While Scoleri lay unconscious, at the very brink of an eternal judgment, on that crucial night of his trial, the Commonwealth produced a witness, Franklin M. Caraker, parole officer, who testified that two days before, and a day after, the murder, he had seen Scoleri walking and had detected no limp or abnormality in his stride. Another witness, John Santarpio, also testified in behalf of the prosecution. The testimony of both witnesses covers 36 pages in the trial transcript and consumed about thirty minutes, during which time the defendant lay inertly on the floor like a log.

The trial judge could easily have cut the Gordian knot of indecision, indefiniteness, and ambiguity at

10:20 p.m., by simply having the doctor examine Scoleri on the spot. Why didn't he do this? If Dr. Carideo had examined Scoleri then and had found that the defendant was malingering, as the judge evidently assumed he was, he could have so stated. Instead, however, of requesting and obtaining reliable medical revelation, the judge embarked on a course of disputation, fault-finding, and uncalled-for berating of defense counsel.

And then there was another pass out of the canyon of controversy as to the defendant's physical condition. The judge could have adjourned court. As stated, it was already 10:20. There was no urgency for driving toward midnight. There is always the possibility and even probability, and certainly at least the hope, that with the passing of the dark hours the perplexities which defy present solution will be considerably simplified after rest and sleep. The dawn often reveals in the dust at our feet the key for which we gropingly and vainly searched during the blackness of the night.

The judge compounded the contretemps of the night of November 24th when he came to his charge. He said to the jury: "Before we start, I want you to know that under professional medical advice this defendant's trial continued, notwithstanding what you have witnessed here in the courtroom. The professional medical advice was that he was competent to hear everything intelligently, his pulse was normal, there was no high blood pressure, no distress, and there was no medical reason for this particular condition, an obvious condition, and the physicians say there was nothing wrong with him whatsoever. Had it been that he was incapable of hearing what was going on here, we could not have proceeded. We would have just had to continue the case. We continued it for one day, as you know."

The judge had acted somewhat as a medical assistant when he stood by as Dr. Carideo examined the de-

fendant during the day of November 24th. Now he acted more or less as a witness. He told the jury that the "professional medical advice was that he was competent to hear everything intelligently." This is the judge testifying, because no one else said that the defendant could "hear everything intelligently." And to say that there was "nothing wrong with him whatsoever" was gross exaggeration. A man who within the previous twelve hours had to have surgical attention to the extent of 24 stitches in his arm and who was fed 100 milligrams of thorazine to tranquilize him, could scarcely qualify as the perfectly healthy man the Government is seeking as the first passenger to travel through space to the farflung planets.

The judge said that if Scoleri had been "incapable of hearing," he would have continued the case. How did he know that Scoleri was not incapable of hearing? He conducted no test for hearing. The record reveals that during the period involved the defendant was mute. Whether he heard or not during this time is something the judge could not possibly be certain about.

It might be relevant to observe that at least one person, impartial and coldly neutral in the proceedings, believed that Scoleri could not hear. Burton A. Chardak of the Philadelphia Bulletin wrote of the session of the morning of November 25, 1958, as follows: "Scoleri, feet dragging, eyes closed, was carried into court at 10:20 a.m. by court officers. *He didn't seem to hear* as he was admonished to keep his head up.

"At one point *in the Commonwealth rebuttal testimony,* the defendant slumped down in his seat. His head fell to one side. It seemed he would have fallen had not a court officer caught him.

"Dr. Louis Carideo, one of two police surgeons in attendance, broke an ampule of smelling salts under his nose. *Scoleri shook his head as if still dazed.*

"Judge VINCENT A. CARROLL said: 'Let it be noted in the record that the defense asked the doctor to examine him in the presence of the jury.' " (Emphasis supplied.)

In his charge to the jury the judge said in scarcely veiled language that Scoleri was malingering. The jury could well have believed that, despite what their eyes told them, the judge had superior knowledge on the defendant's physical condition and that, therefore, they could dismiss from their minds what they saw, and accept, instead, the judge's conclusion that the defendant was indeed malingering. But whether the defendant was feigning an incapacity which did not exist was a question of fact for the jury to determine, since it was directly tied up with the question of credibility. And credibility was all an all-decisive factor in appraising Scoleri's defense.

Scoleri testified that he was elsewhere at the time of murder. He testified to an alibi. If the jury believed that Scoleri was counterfeiting his apparent inability to understand, they could believe that he coined the story of his alibi in the same mint of mendacity. Thus, when the judge took away from the jury the right to determine credibility on that particular phase of the case, the defendant's constitutional rights were directly invaded. He did not receive a trial by jury as it has come down to us through the centuries and he is, therefore, entitled to a new trial.

But the case is even more disturbing than I have indicated. The jury did not hear the statements of the doctors regarding the defendant's condition. They were entirely in the dark as to what had occurred and thus were compelled to follow the lantern held up by the judge, even though its fuel was supplied didactically and not evidentially.

On the morning of November 25th, Dr. Phillip Ingaglio, after examining the defendant, informed the

judge, outside the presence of the jury: "At the present time he [the defendant] is going to be like a log, and he would benefit very much if he had a little bit of psychiatric care now, I think—now that he isn't going to be needed so much for testimony."

Then the following ensued:

"THE COURT: You mean after the case is over?

DR. INGAGLIO: Right at this particular time?

THE COURT: Do you agree with that, Dr. Carideo?

DR. CARIDEO: I think it is something that is worthy of more observation. It would seem to me if he is in a psychiatric condition which would require care, it would certainly be something to antedate this, or precede this, which would take a considerable time hereafter to resolve.

DR. INGAGLIO: That is true.

DR. CARIDEO: I would think his present mood or disposition is something he is going to maintain as long as he is under the same set of circumstances."

After all this, the judge observed: "It follows a pattern. This is not the first time we have seen a situation like this. There is no change, so we will go right ahead."

Here, it would almost seem that the judge had put away his robe and strapped on a stethoscope. He had become a medical consultant. He listened to one doctor say that the defendant's receptivity was equal to that of a log, and he had heard another doctor say that more observation was in order. Then, weighing these scientific findings he concluded, as a diagnostician, that there was "no change." No change from what? No change from normality or no change from abnormality? He based his diagnosis, he said, on the fact that he had seen other situations like this one, and that this one followed "a pattern." Was he referring to a medical pattern, a disease pattern, an evidential pattern, a procedural pattern? But, regardless

of type of pattern, are cases involving life and death to be decided according to diagnostic patterns?

If the jury believed, and they hardly could have believed otherwise from what the judge told them, that Scoleri was malingering, this belief could well have been the additional weight thrown into the scales of deliberation which earned for Scoleri the penalty of death instead of that of life imprisonment, assuming that they would have found him guilty of first degree murder in any event. *On this basis alone, justice demands a new trial for the defendant.*

And I don't think there can be any question that he is entitled to a new trial as the result of our decision in *Commonwealth v. Bonomo*, 396 Pa. 222, and because of the recent legislation of our General Assembly —Act No. 594 of December 1, 1959, P. L. 1621.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE BOK:

I dissent on the one ground that we should, in the interests of justice, require a new trial because of the Act of December 1, 1959, Act No. 594, P. L. 1621, summarized in the Majority opinion and providing for a double verdict in first degree murder cases.

I quarrel with the Majority's argument because I think that it thrusts in the wrong direction. The Legislature has unfalteringly since 1911 turned its face against the introduction of evidence of independent, unconnected crimes, and hence it cannot be said that the Act of 1959 has either a retroactive or a prospective effect. It was passed to correct a bad decision of this Court in *Commonwealth v. Parker*, 294 Pa. 144 (1928), 143 A. 904, which we have followed until now, and hence the Legislature has only repeated what it said in 1911 and has stood for ever since.

The Act of March 15, 1911, P. L. 20, 19 P.S. §711, provided that the defendant in a criminal trial could

not be asked in cross-examination; or required to answer, any question tending to show that he had committed, been charged with, or convicted of any unrelated or unassociated offenses, or tending to show that he was of bad character unless either (1) he had sought to establish his good reputation or (2) had testified against a co-defendant charged with the same offense. This Act was copied after the English Criminal Evidence Act of 1898, but with the significant omission of a third exception, namely, if the evidence of prior offenses went to show the defendant's guilt of the offense for which he was on trial. See the present Chief Justice's dissent in *Commonwealth v. DePofi*, 362 Pa. 229 (1949), 66 A. 2d 649.

By the Act of May 14, 1925, P. L. 759, power was given to juries to fix the penalty in capital cases at death or life imprisonment. Nothing was said in that Act about evidence of other crimes. Because there was no way to permit double or split verdicts and the law as it then stood required a single verdict, this Court, although the Act of 1925 said nothing on the subject, reasoned in *Parker* that the jury should have before it the same evidence that the judge had in order intelligently to fix the penalty.

By the Act of July 3, 1947, P. L. 1239, no evidence of unrelated crimes might be admitted at the trial of anyone charged with crime, with the two exceptions present in the Act of 1911 plus the third which had been omitted from that Act. In *DePofi* the Act of 1947 was held unconstitutional because the exceptions were vague and indefinite and because the title was defective. For present purposes, however, the flat prohibition against admitting evidence of unrelated crimes clearly repeated the Legislature's intention expressed in the Act of 1911.

The Act of 1959 again repeats the Legislature's will on the subject by making procedure for it.

With this unbroken line of legislative purpose from 1911 to 1959, the argument that the Act of 1959 should not be construed retroactively is irrelevant, since the legislative will was the same when Scoleri committed his crimes and at his trial as it was when the Act of 1959 was passed. All that the Act has done is to supply procedure which at last makes realistic the old unreality of telling a jury to forget with one side of its head what it might remember with the other.

The *Parker* case is really all that the Majority has to rely on, granted the Legislature's consistency of purpose since 1911. It is a feeble reed to stand against the reiteration of that purpose in the Act of 1959, which was passed to abolish *Parker,* as the Majority opinion says.

Besides, there is as yet no final judgment here. The case is still *in gremio legis,* and I am not impressed by the notion that if we unwind this tentative judgment we must also unwind the final judgments of all persons now serving life imprisonment for murder in the State. At least they have their lives, which Scoleri soon won't have, and it seems to me reasonable and substantial justice to insist that litigation end with final judgment.

I think that all of the imponderables, plus the ponderable will of the people, consistent since 1911, should compel a new trial, and that we should not be astute in letting a man go to his death *after* the Legislature, in furtherance of its 49-year-old policy, has again expressed itself as clearly as it did less than four months ago.

Mr. Justice COHEN joins in this dissent.

OPINION SUR PETITION FOR REARGUMENT, BY MR. CHIEF JUSTICE JONES, April 19, 1960:

The appellant's petition for reargument erroneously deduces that our decision with respect to the legislative intent of the so-called Split Verdict Act of December 1, 1959, was by six members of the Court who were evenly divided. Such is not the case. Our decision that the statute was not retroactive and, therefore, had no bearing on the *Scoleri* appeal, was by a vote of four to three of the full membership of the court on the question of a new trial because of the statute. However, on the merits of the defendant's appeal the Court was divided six to one—a fact which the petition for reargument understandably does not stress.

The appeal was first argued on October 15, 1959, before the full court of which Mr. Justice McBRIDE, who was serving an appointive term to expire December 31, 1959, was then a member. The appeal not having been disposed of during Mr. Justice McBRIDE's tenure, a reargument was ordered on January 2, 1960, in order that Mr. Justice EAGEN, who was sworn in that day as a member of the court for a full elective term could participate in the disposition of the appeal *on the merits*. The order directing a reargument was as follows: "AND NOW, January 2, 1960, reargument of the above entitled appeal is ordered at the session commencing January 4, 1960, at Philadelphia." In communicating to counsel the substance of this order for reargument, our clerk informed them that the order contemplated a full reargument of the appeal on the merits and that the Court also invited an expression of counsels' views with respect to the intended effect of the Act of December 1, 1959, supra.

When the appeal was reached for reargument on January 14, 1960, Mr. Justice BELL was unavoidably absent. He had, however, heard the appeal fully argued on the merits on October 15, 1959; he had studied the briefs of counsel; and he had participated in the Court's conference discussions on the merits of the appeal. For him, as well as all other members of the Court (except for Mr. Justice EAGEN) a reargument of the appeal was unnecessary and would not have been ordered had Mr. Justice EAGEN heard the original argument. With the expressed approval of all of the other members of the Court, Mr. Justice BELL participated in the voting on the merits of the appeal with the result that the Court stood six to one for affirmance on the merits.

Because Mr. Justice BELL also voted on the question of the legislative intent of the Split Verdict Act, on which he had not heard counsel orally, the petitioner argues that he was thereby denied due process. The complaint is patently groundless. Mr. Justice BELL read the supplemental briefs of counsel on the question of the statute; he considered the Act itself; and he participated in the Court's conference discussions relative to the statute's intended purview—a pure question of law that had arisen subsequent to and *dehors* the *Scoleri* appeal. The solution of that question by the Court required no oral argument of counsel and the members of the Court, who heard counsel's oral argument on the Act, are unanimous that it contained nothing beyond what the supplemental briefs of counsel set forth.

The participation by Mr. Justice BELL in the consideration and decision respecting the legal effect of the Split Verdict Act was with the unanimous approval of the members of the court. The suggestion that the *Scoleri* appeal should be argued again so that the Court could hear further unnecessary oral argument of coun-

sel concerning the new statute, if acceded to by us, would make a mockery of due criminal procedure.

This opinion represents the unanimous view of the members of the Court with respect to the procedural question raised by the petition for reargument. The petition for reargument is denied.